IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 94-50182

---

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

    versus

HAL PETTIGREW, CRAIG WALKER,
and CHAD POWELL,

                              Defendants-Appellants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Consolidated with

---

No. 94-50183

---

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

    versus

GEORGE MONTAGUE,

                              Defendant-Appellant.

---

Appeals from the United States District Court for the
Western District of Texas

---

March 11, 1996

Before WISDOM, GARWOOD and JONES, Circuit Judges.

GARWOOD, Circuit Judge:

Defendants-appellants Hal Pettigrew (Pettigrew), Chad Powell (Powell), George Montague (Montague), and Craig Walker (Walker) appeal their convictions for alleged criminal activities relating to their dealings with Victoria Savings Association (VSA). We affirm in part, reverse in part, and in part reverse and remand for a new trial, as well as partially remanding for resentencing.

## Facts and Proceedings Below

During 1986, Pettigrew engaged in three real estate transactions involving VSA that later became the subject of the present indictment. In each of these transactions, Pettigrew would purchase property on the open market which he would then sell to third party buyers who received financing for the purchase through VSA. The loans made by VSA to the third party purchasers were allegedly over funded, with the excess profits being disguised through the use of sham liens on the properties. Pettigrew would then use these excess funds to purchase "real estate owned" (REO) that VSA had acquired through foreclosure, thereby allowing VSA to remove those properties from its books without suffering any loss due to depressed real estate values. The first of these transactions, referred to as the "Irving/River Run" transaction, occurred in November 1986. William Snider (Snider), acting as trustee for Llano Land Services (Llano Land), a Pettigrew-controlled company, purchased approximately 55 acres of land

2

located in Irving, Texas, for $6.5 million. Later the same day, Snider sold the property to Linus Baer and Carl Bohn, buyers allegedly located by VSA chairman Rupert Hays (Hays) and Powell, for $12,000,020. The approximately $5.5 million profit on the sale was disguised by placing a $5 million sham lien on the property in favor of Loch P. Lomond Production Company (Loch P. Lomond), another Pettigrew-controlled entity. Llano Land then used the $5 million to purchase the River Run Condominiums from VSA, removing them from VSA's inventory of REO. Upon the advice of attorney Ray Williamson (Williamson), Pettigrew sent a letter to VSA purporting to detail the terms of the transaction.

The next transaction, known as "McPherson Park/Luck Field," was similar in its details to the Irving/River Run deal. In December 1986, Donald Johnson, acting as trustee for Crown Oaks Employee Profit Savings Trust (COEPST), another Pettigrew entity, purchased Luck Field for approximately $4.8 million. In January 1987, COEPST sold the Luck Field property to McPherson Park, Ltd. (McPherson Park), a buyer selected by VSA, for approximately $12.5 million financed by VSA. Again, a sham lien for $10 million was placed on the property in favor of Midwest Credit Company (Midwest Credit). Following the closing, $6,100,000 was placed in certificates of deposit held by VSA. Montague sent a letter to Hays at VSA purporting to disclose the terms of the transaction.

The third transaction, known as "Cottonwood/White's Branch," began with the purchase of 205 acres of land for $4,150,000 by Craig Walker (Walker) through his Cottonwood Capital Corporation

3

(CCC), acting as trustee for Pettigrew. The property was sold one week later to White's Branch, Inc. for approximately $6.9 million, financed in part by a $3,100,000 loan from VSA. A lien in favor of Rand Financial Corporation (Rand) was placed on the property for $2.5 million. Once again, Montague sent a letter to Hays purportedly setting forth the terms of the transaction. Approximately $1 million in profits from the McPherson Park/Luck Field and Cottonwood/White's Branch transactions were used to make "commission payments" to one H.E. Preble through an account at VSA which funds were ultimately used to pay delinquent interest on a note held by VSA.

Although the offenses for which the appellants were convicted relate predominantly to the three transactions described above, three additional real estate transactions are relevant to Powell's convictions. During the fall of 1986, R. Mark Pitzer (Pitzer) and Ronnie E. Collins (Collins) approached Hays and Powell at VSA seeking refinancing of notes held on a property referred to as "Barthold Road." VSA allegedly conditioned the refinancing on Pitzer and Collins' agreement to purchase two pieces of VSA's REO, the Cheyenne Plaza Shopping Center (Cheyenne Plaza) and Frankfort Square Shopping Center (Frankford Square), using $800,000 in excess funds to be included in the Barthold Road loan. Attorney J. Mark Hesse (Hesse), Pitzer and Collins' attorney, acted as a third party purchaser of the properties acting through his company, Proformance Incorporated (Proformance), using the excess funds from the Barthold Road loan to make the downpayments. Hesse additionally

4

received "bottom" fifty percent liability on the Cheyenne Plaza and Frankford Square notes. VSA also allegedly agreed to include an additional $700,000 in the Barthold Road loan to secure the cooperation of Pitzer and Collins. Powell was allegedly aware of the structure of the transaction, yet signed loan committee applications that failed to disclose that the purpose of the loan was to finance the purchase of REO from VSA.

A second transaction involved a VSA loan of $6 million to Pitzer and Collins through their Bloomdale Road Joint Venture #1 (Bloomdale Road) purportedly for the purchase of 149 acres in McKinney, Texas. However, the government alleged that the loan was overfunded by approximately $3 million, which was used for the personal benefit of Hays, Powell, Pitzer, and Collins. For example, Powell purchased Hays' share of the Fall Creek Ranch with the proceeds of a sale of a partial interest in the Fall Creek Ranch venture to Pitzer and Collins. Pitzer and Collins had purchased that interest from Powell with a loan from Union Bank which was collateralized by CD's purchased with the proceeds of the Bloomdale Road loan. Once again, it is alleged that Powell was aware that the Bloomdale Road loan was overfunded yet failed to disclose this fact to VSA on committee loan applications that he signed as a VSA officer.

The third transaction involved Powell's receipt of a loan through his wholly-owned company, Royston Properties, Inc. (Royston loan). Powell obtained this loan for the purpose of paying interest on a note (Santexco note) held by First City Bank on which

5

Hays was the guarantor. Hays' interest in the loan was not disclosed to VSA.

On June 23, 1993, a grand jury convened in the Western District of Texas returned a thirty-six count indictment naming Pettigrew, Powell, Montague, and Walker, as well as seven other defendants. The indictment charged the defendants with two conspiracies, as well as numerous substantive offenses relating to their dealings with VSA, primarily bank fraud (18 U.S.C. § 1344(a)(1)) and the making of false entries in the books or records of a lending institution (18 U.S.C. § 1006). Four defendants, including Hays, pleaded guilty either before or during the early stages of the trial, while three others were acquitted by the jury.

Following trial, Pettigrew was convicted of two counts of conspiracy, two counts of bank fraud (18 U.S.C. § 1344), three counts of aiding and abetting false entries in the records of a lending institution (18 U.S.C. § 1006), and one count of money laundering (18 U.S.C. § 1957). Powell was convicted of the two conspiracy counts as well, along with six counts of making false entries (18 U.S.C. § 1006), five counts of aiding and abetting insider participation in the receipt of loan proceeds with the intent to defraud VSA and an agency of the United States (18 U.S.C. § 1006), two counts of bank fraud (18 U.S.C. § 1344(a)(1)), and one count of misapplication of funds (18 U.S.C. § 657). Walker and Montague were both acquitted of the two conspiracy counts charged in the indictment. However, Walker was convicted of one count of aiding and abetting bank fraud and one count of aiding and abetting

6

the making of false entries, while Montague was convicted of two counts of bank fraud (18 U.S.C. § 1344(a)(1)) and three counts of aiding and abetting the making of false entries (18 U.S.C. § 1006). Appellants now bring this appeal.

## Discussion

### I. Instructional Errors

The trial court's refusal to include a requested instruction in the charge to the jury is usually reviewed for abuse of discretion, and the court is given substantial latitude in formulating the charge. *United States v. Storm*, 36 F.3d 1289, 1294 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 1798 (1995). Generally, refusal to include a requested instruction is reversible error only if the requested instruction is substantially correct, the actual charge given the jury did not substantially cover the content of the proposed instruction, and the omission of the proposed instruction would seriously impair the defendant's ability to present a defense. *Id; United States v. Correa-Ventura*, 6 F.3d 1070,1076(5th Cir. 1993).

### A. 18 U.S.C. § 1006

All of the appellants urge, and indeed the government concedes, that the district court erred in refusing to submit appellants' requested materiality instruction with respect to the section 1006 counts. We agree.

In order to establish a violation of section 1006, which prohibits the making of false entries in the records of a lending institution, the government must establish beyond a reasonable

7

doubt that: (1) the lending institution was one of those described in section 1006; (2) the individual making the entry was an officer, agent, or employee of the institution; (3) the individual knowingly or willfully made, or caused to be made, a false entry concerning a *material fact* in a book, report or statement of the institution; and (4) the individual acted with the intent to injure or defraud the institution or any of its officers, auditors, examiners, or agents. *United States v. Beuttenmuller*, 29 F.3d 973, 982 (5th Cir. 1994). Thus, materiality is an essential element of the false entry offense. *Id.; see also United States v. Parks*, 68 F.3d 860, 865 (5th Cir. 1995), *cert. denied*, 64 USLW 3502 (1996).

In *Beuttenmuller*, we stated that "[w]hile materiality rests upon a factual evidentiary showing by the prosecution, the actual determination of materiality is a question of law for the court . . . ." *Beuttenmuller*, 29 F.3d at 982. However, the Supreme Court's recent decision in *United States v. Gaudin*, 115 S.Ct. 2310 (1995), teaches otherwise. In *Gaudin*, the Supreme Court indicated that the determination of materiality under a related statute, 18 U.S.C. § 1001, was not a pure question of law, but rather a mixed question of law and fact. *Id*. at 2314-15. More importantly, a unanimous Court held that the Fifth and Sixth Amendments demanded that the defendant's guilt of the element of materiality, like all other elements of the crime, be determined beyond a reasonable doubt by a jury of his peers.[1] *Id.* at 2320.

---

[1] While we are cognizant of the fact that one panel of this Court is generally powerless to overrule the previous decision of another panel absent rehearing by the full Court sitting *en banc*,

8

The government, while conceding that the trial court's failure to give the materiality instruction was error, insists that the error was harmless. This argument appears to us to be foreclosed by the Supreme Court's reasoning in *Sullivan v. Louisiana*, 113 S.Ct. 2078, 2081-82 (1993). In *Sullivan*, the Supreme Court was presented with the question whether the harmless error analysis could be applied to a defective reasonable doubt instruction. Justice Scalia, writing for a unanimous Court, observed that harmless error review requires a court to determine what effect the constitutional error had upon the verdict rendered by the jury. *Id*. at 2081. Therefore, the Court concluded that where there is defective reasonable doubt instruction, harmless error review is simply not possible as there is no verdict upon which the analysis can operate. *Id*. at 2082. In other words, "[t]here being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the *same* verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless." *Id*.

The reasoning of *Sullivan* leads inescapably to the same conclusion in the present case. Because the element of materiality was withheld from the jury, the jury rendered no verdict as to that particular element of the offense. Thus, the harmless error

---

an exception to this rule arises when there has been an intervening decision by the United States Supreme Court overriding the earlier decision. *United States v. Parker*, 73 F.3d 48, 51 (5th Cir. 1996). Given the Supreme Court's decision in *Gaudin*, we conclude that *Beuttenmuller's* holding that materiality under section 1006 is a question of law for the court has been overruled.

analysis is similarly inapplicable.

Having found that appellants' convictions under section 1006 were fatally flawed, we are similarly compelled to reverse the convictions for conspiracy found in count thirty-six. Although making false entries in violation of section 1006 was but one of several object offenses alleged in the indictment, where a general verdict form allows for conviction for conspiracy to commit any one of several object offenses a legal defect in any one of the offenses alleged will require reversal of the conspiracy conviction. *United States v. Smithers*, 27 F.3d 142, 147 (5th Cir. 1994).[2] The trial court's failure to instruct the jury with respect to the materiality element of the false entry offense raises the possibility that appellants' conspiracy conviction rests upon legally inadequate grounds. Because we are unable to determine on review which object offense the jury selected, we reverse.[3]

B.  18 U.S.C. § 1344(a)(1)

Pettigrew and Montague urge that their convictions for bank fraud under 18 U.S.C. § 1344(a)(1) must also be reversed due to an

---

[2]  We take care to note the distinction between a general verdict for conspiracy that rests upon legally inadequate grounds such as the one with which we are presented today and a general verdict that rests upon *insufficient evidence* that does not require reversal. For a discussion of this distinction, *see Griffin v. United States*, 112 S.Ct. 466 (1991).

[3]  Because we reverse on the basis of the materiality instruction, we do not reach the question whether the trial court adequately instructed the jury on the intent element of the section 1006 offense.

instructional defect.[4]  Section 1344(a)(1) provides that it shall be a crime to "knowingly execute[], or attempt[] to execute, a scheme or artifice— (1) to defraud a federally chartered or insured financial institution . . . ."[5]  "The requisite intent to defraud is established if the defendant acted knowingly and with the specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to himself."  *United States v. Saks*, 964 F.2d 1514, 1518 (5th Cir. 1992) (citations omitted);  *see also United States v. Dobbs*, 63 F.3d 391, 395 (5th Cir. 1995).

The trial court denied Pettigrew's request to submit an instruction to the jury defining "intent to defraud" that was substantially in accord with the definition set forth in *Saks.*[6] Furthermore, the instruction given by the trial court did not specifically define "intent to defraud" for purposes of section

---

[4]   Montague adopts this point of error from Pettigrew's brief. Although Walker and Powell were also convicted of offenses under this section, they have neither briefed nor moved to adopt this point of error.  Therefore, any such error is waived.

[5]   Section 1344 was amended in 1989 to designate former subsection (a) as an entire section which now reads:  "Whoever knowingly executes, or attempts to execute, a scheme or artifice (1)  to defraud a financial institution . . . ."

[6]   Pettigrew's requested instruction read: "To act with the intent to defraud means to act knowingly with the specific intent to deceive or cheat for the purpose of causing some financial loss to another or to bring some financial gain to oneself."
The trial court's denial of Pettigrew's requested instruction preserved error as to both Pettigrew and Montague as the district court had informed the defendants that any written request to charge not read to the jury would be deemed denied and constituted objection by all defendants.

1344(a)(1).[7] Pettigrew and Montague contend that the failure to submit the requested instruction allowed the jury to convict upon a finding of deceit alone without finding that appellants possessed the specific intent to defraud which is necessary element of the offense. Appellants argue that this error was further exacerbated by the fact that "intent to defraud" was defined elsewhere in the instructions as "intent to deceive or cheat," and by the fact that the prosecutor repeatedly equated "intent to deceive or cheat" with "intent to defraud" during closing arguments.

Appellants assert that the failure to submit the requested instruction was reversible error because it hampered their ability to advance the defense that even if the sham liens were intended to deceive, they were employed for the purpose of helping, rather than

---

[7]    The trial court's section 1344(a)(1) charge reads as follows:

   "Title 18 United States Code section 1344(1) [sic] makes it a crime for anyone to knowingly execute or attempt to execute a scheme or artifice to defraud a federally chartered and insured financial institution. For you to find a defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt.
   First, that the defendant devised a scheme or artifice to defraud a federally chartered and insured financial institution.
   Second, that the defendant executed or attempted to execute the scheme or artifice.
   And third, that the defendant acted knowingly.
   The term scheme or artifice to defraud includes any plan, pattern or course of action intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived.
   The term federally chartered or insured financial institution includes a savings and loan association with deposits insured by the federal savings and loan insurance corporation."

12

harming, VSA by removing REO from its books.[8]

However, our review of the record leads us to conclude that appellants' proposed "intent to defraud" instruction was substantially covered in the charge given by the trial court. While the court did not specifically define "intent to defraud" in its instructions to the jury, the court did charge the jury that: "[t]he term scheme or artifice to defraud includes any plan, pattern or course of action *intended to deceive others in order to obtain something of value*, such as money, *from the institution* to be *deceived*." (Emphasis added).[9] The trial court further instructed the jury that in order to find a defendant guilty it must find "that *the defendant devised* a scheme or artifice to defraud a federally chartered and insured financial institution." (Emphasis added). Based on the instructions given, the jury could not logically have found that the appellants devised a scheme or artifice to defraud VSA without finding that they necessarily possessed the specific intent to cause some financial loss to the institution.

Because appellants' proposed instruction was both substantially covered by the charge given by the trial court and in

_____

[8]   Appellants cite testimony by Rupert Hays at trial that the Pettigrew transactions were intended to "benefit" or "maintain the financial strength" of VSA as evidence that they lacked the necessary intent to defraud.

[9]   While it would have been preferable in a case such as the present to replace "includes" with "means" in this instruction, there was no objection on that basis, and in context it is reasonably clear that the remaining portion of the sentence constituted a required element of the offense.

no way impaired appellants' ability to present a defense, we find no reversible error.

C.   18 U.S.C. § 1957

The money laundering statute under which Pettigrew was convicted, 18 U.S.C. § 1957, provides that it shall be a crime to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity . . . ."  The knowledge element of the offense requires that the defendant know that the property in question is "criminally derived," although it does not require knowledge that the property was derived from "specified unlawful activity."  *See United States v. Baker*, 19 F.3d 605, 614 (11th Cir. 1994); *United States v. Campbell*, 977 F.2d 854, 859-60 (4th Cir. 1992), *cert. denied*, 113 S.Ct. 1331 (1993).

Our review of the instruction given by the trial court persuades us that Pettigrew's conviction on the money laundering count (Count 35) must be reversed.[10]  The court's instructions may

---

[10]    The trial court instructed the jury in relevant part as follows:

"Title 18 United States Code 1957 makes it a crime for anyone to knowingly engage in a monetary transaction in the United States in criminally derived property that is of a greater value than ten thousand dollars and is derived from specified unlawful activity.
For you to find a defendant guilty of this crime you must be convinced that the government has proven each of the following beyond a reasonable doubt.
First, that the defendant Hal Pettigrew knowingly engaged in a monetary transaction by, through or to the Victoria Savings Association.
Second, in criminally derived property  of a value

14

most reasonably be read to permit conviction if Pettigrew knowingly engaged in the transaction and the funds involved were in fact criminally derived without requiring any showing by the government that Pettigrew knew that the funds in question were criminally tainted.[11]

D.  Other Instructional Complaints

Pettigrew additionally maintains that the district court erred in refusing both his proposed instructions on the defense theory of the case and on the defense of withdrawal from the conspiracy. These contentions are without merit.

In order to establish the defense of withdrawal from a criminal conspiracy, the defendant must prove "'[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators.'" *United*

---

greater than ten thousand dollars.
    And third, that the criminally derived property was from specified unlawful activity.
    . . . .

    The government is not required to prove that the defendant knew that the offense from which the criminally derived property was derived was a specified unlawful activity."

[11]    We also note that the indictment charged that Pettigrew and Hays had transferred illegal proceeds between NCNB Medical Center Bank and Texas Commerce Bank-Arlington, while the court's charge referred only to "a monetary transaction by, through, or to the Victoria Savings Association."  Although it does not appear that Pettigrew objected to this aspect of the instruction at trial, at least if properly preserved, this constructive amendment of the indictment would likely also have required reversal of this count. *See United States v. Restivo*, 8 F.3d 274, 279 (5th Cir. 1993)(reversal required if instruction permitted jury to convict on factual basis that modified essential element of offense charged), *cert. denied*, 115 S.Ct. 54 (1994).

15

*States v. MMR Corp.(LA)*, 907 F.2d 489, 500 (5th Cir.) (*quoting United States v. United States Gypsum Co.*, 98 S.Ct. 2864, 2887-88 (1978)), *cert. denied*, 111 S.Ct. 1388 (1991); *see also United States v. Stouffer*, 986 F.2d 916, 922 (5th Cir.), *cert. denied*, 114 S.Ct. 115 (1993).

Pettigrew was not entitled to an instruction on the withdrawal defense because it was not sufficiently raised by the evidence. The so-called "disclosure letters" that Pettigrew caused to be sent to Hays at VSA are simply not inconsistent with the object of the conspiracy. The letters do not purport to be a withdrawal from or abandonment of anything; nor do they purport to disclose any criminal activity. While these letters reference the liens on the properties, there is no indication that these liens do not represent legitimate financial obligations. Furthermore, even had the sham liens been fully disclosed, letters to a co-conspirator who also happens to be an insider at VSA detailing the structure of the transactions do not constitute evidence of withdrawal. Pettigrew had no reason to believe that Hays as a co-conspirator would disclose these letters to either VSA or bank regulators. Accordingly, the district court did not err in refusing Pettigrew's proposed withdrawal instruction.

While "[a] defendant is usually entitled to have the court instruct the jury on the defense's 'theory of the case' . . . the positing of a charge as the defendant's theory of the case does not automatically secure for the defendant a judicially narrated account of 'his' facts and legal arguments." *United States v.*

16

*Robinson*, 700 F.2d 205, 211 (5th Cir. 1983).  Pettigrew's proposed instruction represents just such a "judicially narrated account of 'his' facts."[12]  The district court did not err in refusing such an instruction.

## II.  Admissibility of Evidence

### A.  Polygraph Evidence

Pettigrew argues that the district court erred in excluding from evidence results of a polygraph examination that Pettigrew maintains support his defense that he lacked the intent to deceive bank regulators regarding the nature of his transactions with VSA. Following the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 113 S.Ct. 2786 (1993), we have recently reexamined our previous position that polygraph evidence  is *per se* inadmissible.  In *United States v. Posado*, 57 F.3d 428 (1995), a panel  of  this  Court  held  that  a  *per  se*  rule  against  the admissibility  of  the  results  of  a  polygraph  examination  was  no longer permissible.

While *Posado* rejected across-the-board application of a *per se* rule of inadmissibility to polygraph evidence, we expressly stated, "we do not now hold that polygraph examinations are scientifically valid or that they will always assist the trier of fact . . . ." *Posado*, 57 F.3d at 434.  As  this statement suggests, the district court is always to be guided by the twin precepts of Rule 702:  the

---

[12]    For instance, Pettigrew's proposed instruction would have stated that "[h]e fully disclosed all aspects of the transactions in disclosure letters mailed to Victoria Savings Association, which letters were intended by Mr. Pettigrew to be placed in the files of Victoria."

17

scientific validity of the method, and ability to "assist the trier of fact to understand the evidence or determine a fact in issue . . . ." This necessarily flexible inquiry, like all others under Rule 702, is left to the sound discretion of the trial court and is reviewed on appeal only for abuse of discretion. *See Eiland v. Westinghouse Corp.*, 58 F.3d 176, 180 (5th Cir. 1995)(admission or exclusion of expert opinion testimony under Rule 702 will not be disturbed unless "manifestly erroneous"); *see also, United States v. Powers*, 59 F.3d 1460, 1471 (4th Cir. 1995)(refusal to admit scientific evidence reviewed for abuse of discretion), *cert. denied*, 116 S.Ct. 784 (1996).

We conclude that our decision in *Posado* does not require reversal in the present case for several reasons. As the Supreme Court observed in *Daubert*, the determination of whether proffered scientific evidence will assist the trier of fact is essentially a relevance inquiry. *Daubert*, 113 S.Ct. at 2795-96. "'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" *Id*. at 2795 (*quoting* 3 Weinstein & Berger 702[02], p. 702-18). The results of the polygraph examination that Pettigrew wished to introduce related to three questions asked by the examiner in response to which Pettigrew: (1) agreed that Hays had first proposed the idea to create the sham liens; (2) agreed that he disclosed the liens in letters which he caused to be sent to Hays; and (3) denied that he knew that the letters would be hidden from bank regulators. The first two of these responses are simply immaterial to the question whether

18

Pettigrew intended to deceive the bank regulators.  Nor can we say that the district court abused its discretion in excluding the third response which, while arguably more relevant, suggests only that Pettigrew did not *know* that the letters would not be disclosed.  The fact that he did not know that the letters would be disclosed to regulators does not mean that he did not at least think that it was highly unlikely.

Pettigrew argues that the fact that the district court denied his motion requesting the admission of the polygraph results without a hearing indicates that the court necessarily applied a *per se* rule of inadmissibility.  While generally we do not sanction efforts  to "short-circuit" the *Daubert* analysis, when the offer fails the  second prong of the Rule 702 inquiry we see little reason to force a district court to expend precious judicial resources in painstakingly evaluating the scientific validity of the evidence under *Daubert*.

Further, even if the evidence offered by Pettigrew survived the Rule 702 inquiry, the potential for prejudice created by such evidence is high in the absence of appropriate safeguards.  In *Posado*, we suggested that an "enhanced role" for Rule 403 may be appropriate in the context of the *Daubert* analysis due to the possible prejudicial effect of  polygraph evidence in comparison to its probative value.  We identified several safeguards present in *Posado* which operated to counterbalance such prejudice. For instance, the prosecution was contacted before the examination was administered and given the opportunity to participate, and the

19

evidence was not offered at trial before a jury but in a pretrial suppression hearing before a judge who would be less likely to be "intimidated by claims of scientific validity." *Posado*, 57 F.3d at 435. We further observed that the rules of evidence are relaxed in pretrial suppression hearings. *Id.*

None of these safeguards were present in the case before us. The polygraph examination was administered by an expert selected by the defense apparently without the participation of the government, and the defense wished to present this evidence before the jury. While these factors may not always be conclusive, the absence of these or other similar safeguards certainly weighs most heavily against the admission of polygraph evidence.

While express findings by the district court are generally the preferred practice, in the present context we cannot say that the district court abused its discretion on the record before us.

B. Testimony of Government's Expert Witness

Montague argues that the district court erred in admitting certain testimony by William Black (Black), the government's expert witness on fraud in the savings and loan industry, because Black both offered legal conclusions and testified as to the mental state of the defendants.

Montague relies primarily on our decision in *Owen v. Kerr-McGee Corp.*, 698 F.2d 236 (5th Cir. 1983), in which we noted that while Federal Rule of Evidence 704 abolished the old rule against witnesses testifying as to "ultimate issues," Rule 704 was not intended to allow a witness to testify regarding legal conclusions.

*Id.* at 239-40. Montague notes that throughout his direct testimony, Black repeatedly responded to hypotheticals posed by the prosecutor by concluding that the acts described constituted a "crime," "fraud," "deception," or "cover-up." Montague contends that by framing his responses as legal conclusions, Black was in effect instructing the jury as to the verdict it should reach.

Assuming *arguendo* that Black's testimony was error under *Owen*, such error was not preserved by proper objection. In order to preserve error for appellate review, a defendant's objection to the admission of evidence must adequately apprise the trial judge of the grounds for objection. *United States v. Waldrip*, 981 F.2d 799, 804 (5th Cir. 1993); *United States v. Tomblin*, 46 F.3d 1369, 1387 n.42 (5th Cir. 1995). Upon review of the record, we find no objection by any defendant during the entire course of the government's direct examination of Black to the effect that Black's testimony constituted an impermissible legal conclusion.[13] Thus, we conclude that no error was preserved.

Montague also asserts that Black's testimony was improper because it violated Federal Rule of Evidence 704(b)'s prohibition against expert testimony regarding whether the defendant possessed the mental state that is a necessary element of the offense charged. Specifically, Montague complains of Black's responses to hypotheticals posed by the prosecutor that the participants in such

---

[13] We note that when a proper objection was raised to a question soliciting a response involving a legal conclusion during the government's redirect examination of Black, the objection was sustained by the trial court.

a scheme had to be "in on it," had engaged in a "deception" and a "cover-up," and that the disclosure letters were a "confession." However, again there was no objection to any of these statements by Black at the time that they were made.[14] Therefore, the admission of these statements is reviewable only for plain error, *United States v. Aggarwal*, 17 F.3d 737, 743 (5th Cir. 1994), and we find no such error here. *See id.* (use of terms "scam," "fraud," and "fraudulent" not plain error).

C.   Improper Cross-examination By Government

Pettigrew asserts that the government engaged in prosecutorial misconduct throughout the trial by insinuating his guilt through the improper questioning of witnesses. The only potential error of this type which warrants discussion pertains to the government's cross-examination of Pettigrew's attorney, Ray Williamson. On cross-examination, the prosecutor asked Williamson whether another transaction in which he and Pettigrew had engaged was "itself the subject of an investigation." Williamson denied that he knew of any such investigation. While recognizing that neither prior bad acts of a witness nor the mere fact that a witness has been arrested or indicted is generally admissible for impeachment

---

[14]     Although the defendants filed a joint motion to strike Black's testimony the following day, we do not believe that this satisfies Fed. R. Evid. 103(a)(1)'s requirement of a "*timely* objection or motion to strike." Furthermore, the motion to strike complained only that Black's characterization of the hypothetical *transactions* as "fraudulent" constituted improper testimony regarding the defendant's mental state. Our decision in *Aggarwal*, 17 F.3d at 743, suggests that expert opinion that a given scheme was fraudulent is not necessarily improper. No reversible error is presented.

22

purposes as a conviction would be,[15] we have also recognized that where the arrest or accusation arises out of the transaction at issue it is admissible to show the potential bias of the witness. *United States v. Musgrave*, 483 F.2d 327, 338 (5th Cir.), *cert. denied*, 94 S.Ct. 447 (1973). We believe that the case before us presents an analogous situation. The fact that another transaction in which Pettigrew and Williamson were involved was under investigation would clearly demonstrate potential bias on Williamson's part as to how he characterized the transactions at issue in the present case. As it appears the government had a good faith basis for the question, we find no reversible error here.

## III.  Improper Joinder and Denial of Outsiders' Motion to Sever [16]

Montague asserts that the district court erred in denying his objection to the joinder of all defendants, both VSA insiders and outsiders, in a single trial.  In the alternative, Montague maintains that reversal is required because the district court denied requests to sever the two VSA insiders from the outsider defendants, and failed to take adequate steps to insulate the outsider defendants from spillover prejudice.

Federal Rule of Criminal Procedure 8(b) provides that "[t]wo or more defendants may be charged in the same indictment or

---

[15]   *United States v. Greer*, 939 F.2d 1076, 1097 (5th Cir. 1991)(prior bad acts), *cert. denied*, 113 S.Ct. 1390 (1993); *United States v. Abadie*, 879 F.2d 1260, 1267 (5th Cir.), *cert. denied*, 110 S.Ct. 569 (1989).  However, that a witness *for the government* is under indictment by it is admissible for impeachment purposes. *See United States v. Alexius*, ___ F.3d ___ (5th Cir. Feb. 15, 1996, No. 95-50175).

[16]   Pettigrew adopts this point of error.

23

information if they are alleged to have participated . . . in the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b). The propriety of joinder is determined on the basis of the allegations in the indictment that are accepted as true barring charges of prosecutorial misconduct. *United States v. Faulkner*, 17 F.3d 745, 758 (5th Cir.), *cert. denied*, 115 S.Ct.193 (1994). As a general rule, persons indicted together should be tried together, particularly in conspiracy cases. *United States v. Neal*, 27 F.3d 1035, 1045 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 1165 (1995), "[P]roper joinder requires that the offenses charged 'must be shown to be part of a single plan or scheme,' and . . .'[p]roof of such a common scheme is typically supplied by an overarching conspiracy from which stems each of the substantive counts.'" *Faulkner*, 17 F.3d at 758(*quoting United States v. Lane*, 735 F.2d 799. 805 (5th Cir. 1984), *rev'd in part o.g.*, 106 S.Ct. 725 (1986)). In the present case, each of the counts charged in the indictment stems from a common conspiracy to defraud VSA and bank regulators. Thus, joinder of all defendants was proper.

Once it is established that joinder was proper, denial of a motion to sever is reviewable only for abuse of discretion. *Faulkner*, 17 F.3d at 758. "[W]hen defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or

24

innocence." *Zafiro v. United States*, 113 S.Ct. 933, 938 (1993). "To demonstrate an abuse of discretion, the defendant 'bears the burden of showing specific and compelling prejudice that resulted in an unfair trial,'. . . and such prejudice must be of a type 'against which the trial court was unable to afford protection.'" *Faulkner*, 17 F.3d at 759 (*quoting United States v. Holloway*, 1 F.3d 307, 310 (5th Cir. 1993), and *United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir.), *cert. denied*, 114 S.Ct. 266 (1993)).

The arguments advanced by Montague are, for the most part, identical to those that we addressed in *United States v. Neal*, 27 F.3d 1035 (5th Cir. 1994). Montague contends that the outsiders were prejudiced by the large volume of evidence introduced with respect to the insider fraud at VSA, and that the trial court failed to administer proper limiting instructions to insulate the outsiders from spillover prejudice. However, as we observed in *Neal*, "a quantitative disparity in the evidence 'is clearly insufficient in itself to justify severance.'" *Id.* at 1045 (*quoting United States v. Harrelson*, 754 F.2d 1153, 1175 (5th Cir.), *cert. denied*, 106 S.Ct. 599 (1985)). Nor does the "mere presence" of spillover prejudice ordinarily require severance, particularly when the defendants are convicted of participating in the same conspiracy. *Id.* Finally, the fact that—as here—the jury returned verdicts of "not guilty" as to some of the defendants clearly suggests that it was able to take a discerning approach to the evidence presented. *Id.* Insofar as Montague's claimed error lies in the trial court's failure to give limiting instructions

25

with respect to evidence that may have been relevant only to some defendants, we are unable to conclude that this was an abuse of discretion as Montague has identified no "specific and compelling prejudice" that he and the other outsider defendants suffered as a result.

However, Montague also contends that severance was required because the outsider defendants wished to exclude any testimony relating to the guilty pleas of co-conspirator witnesses who would testify at trial, while the insider defendants wished to utilize this evidence to impeach those government witnesses. In *United States v. Handly*, 591 F.2d 1125, 1128 (5th Cir. 1979), we held that a prosecutor's reference to the guilty pleas of a defendant's co-conspirators was error, unless the defendant chose to rely on the guilty pleas of his co-conspirators as part of his defense strategy. We first note that the Supreme Court has held that mutually antagonistic defenses are not prejudicial *per se*, and severance is not necessarily required even if some prejudice is shown. *Zafiro*, 113 S.Ct. at 938. Rather Rule 14 leaves "the tailoring of the relief to be granted, *if any*, to the district court's sound discretion." *Id.* (emphasis added). Again, the fact that the jury returned "not guilty" verdicts as to some defendants strongly suggests that there was no such prejudice here. Further, that these witnesses had pleaded guilty would add little to their admissible testimony as to the conspiracy and their role in it.[17]

---

[17] We do not here deal with prosecution references to guilty pleas by co-conspirators who do not testify.

26

Finally, contrary to Montague's representations in his brief, the district court properly instructed the jury that "[t]he fact that an accomplice has entered a plea of guilty to the offense charged is not evidence in and of itself of the guilt of any other person."[18]  Therefore, the district court acted within its discretion in declining to sever Montague and the other outsider defendants for trial.

## IV.  Sufficiency of the Evidence

In reviewing a challenge to the sufficiency of the evidence to support a defendant's conviction, we must affirm the jury's verdict if, viewing the evidence and the inferences that may reasonably be drawn from it in the light most favorable to the verdict, a rational trier of fact could have found that the evidence establishes the defendant's guilt beyond a reasonable doubt. *United States v. Garza*, 42 F.3d  251,253(5th Cir. 1994), *cert. denied*, 115 S.Ct. 2263 (1995).  "The evidence need not exclude every reasonable hypothesis of innocence  or be wholly inconsistent

---

[18]     Montague states in his brief: "The court further compounded the prejudice to Mr. Montague and the other outsiders by suggesting in its final instructions that the guilty pleas could be considered at least as supporting other evidence of a defendant's guilt."  In fact, the trial court instructed the jury as stated in the text and also as follows:

> "An alleged accomplice, including one who has entered into a plea agreement with the government, is not prohibited from testifying.  On the contrary, the testimony of such a witness may alone be of sufficient weight to sustain a verdict of guilty.  You should keep in mind that such testimony is always to be received with caution and weighed with great care.
> You should never convict an accused upon the unsupported testimony of an alleged accomplice unless you believe that testimony beyond a reasonable doubt."

27

with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence." *United States v. Bermea*, 30 F.3d 1539, 1551 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 1113 (1995).

A. Evidence of VSA's Federally Insured Status [19]

Powell, relying on *United States v. Schultz*, 17 F.3d 723 (5th Cir. 1995), argues that the government's failure to introduce sufficient evidence of VSA's federally-insured status requires reversal of all counts of the indictment. Powell argues that reversal is required both because federally-insured status is a necessary prerequisite to federal jurisdiction and because federally-insured status is a necessary element of every offense charged in the indictment.[20]

We find sufficient evidence of VSA's federally-insured status. Former VSA President Barron offered testimony that the funds of VSA were insured "at that time" by the FSLIC, and Powell himself acknowledged the federally-insured status of VSA on cross-examination by the government. As we noted in *Schultz*, "[i]f those officials had possessed personal knowledge of the bank's insurance status, their testimony that [the bank] was insured by the FDIC during the period in question, if unchallenged, would have sufficiently proven the jurisdiction issue in the case *sub judice*."

---

[19] Pettigrew and Montague adopt this point of error.

[20] Although not an element of money laundering under 18 U.S.C. § 1957, money laundering does require proof that the funds were proceeds of unlawful activity, and the unlawful activity alleged in the indictment was the use of a scheme or artifice to defraud a federally insured financial institution.

28

*Schultz*, 17 F.3d at 727. A Supervisory Agreement entered into by VSA and the FSLIC as well as an accompanying VSA Board of Directors resolution both make reference to violations of FSLIC regulations occurring in November 1986. All the several VSA printed letterheads in evidence bore the legend "Member FSLIC." Finally, the government introduced copies of both a FSLIC certificate of insurance issued to "Victoria Federal Savings and Loan Association" with an original issuance date of March 25, 1935, and a copy of a 1987 Texas Savings and Loan Department examination of VSA "as of 12-31-86" that identifies VSA's date of insurance as "3-25-35." Despite the inclusion of the word "federal" in the name on the certificate of insurance, the jury could reasonably infer from the evidence that these documents both referenced VSA. When viewed cumulatively, a rational jury could have concluded from all the evidence that VSA was a federally-insured institution.[21]

B. Pettigrew

Pettigrew argues that there is insufficient evidence to support his conviction of a conspiracy to defraud the United States in violation of 18 U.S.C. § 371 as charged in Count One of the indictment. To establish a conspiracy under section 371, the government generally must prove beyond a reasonable doubt that (1) there was an agreement between two or more persons to pursue an unlawful objective, (2) the defendant voluntarily agreed to join the conspiracy, and (3) that one of the persons committed an overt act in furtherance of the conspiracy. *Faulkner*, 17 F.3d at 768;

---

[21] Nothing suggests that VSA was not so insured.

*United States v. El-Zoubi*, 993 F.2d 442, 445 (5th Cir. 1993).

Pettigrew essentially argues that there is insufficient evidence that he agreed to join with Hays and others in a conspiracy to defraud the United States of the lawful government functions of the Federal Home Loan Bank Board as charged. The agreement to join a conspiracy need not be express, but may be inferred from circumstantial evidence. *United States v. Hopkins*, 916 F.2d 207, 212 (5th Cir. 1990); *see also United States v. Schmick*, 904 F.2d 936, 941 (5th Cir. 1990) (any element of conspiracy may be inferred from circumstantial evidence), *cert. denied*, 111 S.Ct. 782 (1991). There is ample evidence in the record from which a rational juror could infer Pettigrew's agreement to join the conspiracy. Pettigrew was aware of the use of the sham liens to disguise the excess profits from the transactions, and Pettigrew-controlled entities and associates were employed to disguise the fact that these loan proceeds were then being used to purchase REO from VSA. Pettigrew's conviction on Count One must be affirmed.

Pettigrew additionally maintains that there is insufficient evidence that he possessed the necessary criminal intent to support his convictions under 18 U.S.C. §§ 1006 and 1344(a)(1). Pettigrew first maintains that there is no evidence in the record that Hays ever informed him that the purpose of the liens was to deceive bank regulators. However, the record reflects that Hays testified on direct examination that he told Pettigrew that the River Run transaction needed to be designed so that VSA could book the

30

transaction as a sale in order to avoid raising "a red flag, as far as external auditors, as well as the examiners." This testimony when viewed in conjunction with the extensive involvement of Pettigrew employees, associates, and entities in these transactions provides sufficient evidence from which a rational juror could conclude that Pettigrew knew of the purpose of the sham liens.

Pettigrew additionally argues that the letters that he sent or caused to be sent to Hays discussing the terms of the transactions were inconsistent with any intent to defraud VSA or deceive federal regulators. However, as we indicated during our earlier discussion of Pettigrew's entitlement to a withdrawal instruction, these letters simply do not constitute evidence of withdrawal or any other action inconsistent with the required intent. While the letters refer to the imposition of the liens, they do not indicate that these liens do not represent an actual financial obligation or the purpose for which they were imposed. If anything, we read these letters as further evidence of Pettigrew's illicit purpose rather than as evidence of acts inconsistent with such intent.

Finally, Pettigrew argues that he acted in good faith reliance on the advice of counsel, thereby precluding any intent to defraud VSA or deceive the examiners. As we have previously noted, "[s]trictly speaking, good faith reliance on advice of counsel is not really a defense to an allegation of fraud but is the basis for a jury instruction on whether or not the defendant possessed the requisite specific intent." *United States v. Carr*, 740 F.2d 339, 346 n.11 (5th Cir. 1984). Such an instruction was given in the

31

present case, and the jury apparently concluded that Pettigrew possessed the necessary intent. Based on the record before us, we cannot say that this was error.

B. Montague

Montague also challenges the sufficiency of the evidence that he possessed the necessary intent to support his convictions under 18 U.S.C. §§ 1006 and 1344(a)(1). Like Pettigrew, Montague relies on evidence that he acted pursuant to the advice of Williamson and sent letters to Hays purporting to disclose the terms of the transactions as evidence that he lacked the requisite intent, and these arguments prove similarly unavailing. As discussed above, whether reliance on the advice of counsel is inconsistent with the requisite intent is an issue for the jury's determination, and we cannot say that the jury erred on the record before us. Nor do the letters sent by Montague to Hays at VSA constitute evidence inconsistent with the intent to defraud or deceive, as they do not disclose that the liens were shams.

The only additional argument raised by Montague is that there is no evidence that he was aware that the sham liens would be referred to in the sellers' closing statements on the properties, and therefore he lacked the necessary intent to support his conviction for aiding and abetting Hays on the false entry counts (Counts 12, 23, 24). However, the government introduced as an exhibit an internal Crown Oaks memorandum prepared by Cheryl Moczygemba (Moczygemba) that details the McPherson Park transaction, and states, "[f]or 'looks' sake, Victoria Savings did

32

not want to show such a large figure going back to the seller on the *closing statement*." (Emphasis added). Montague apparently instructed Moczygemba to be "careful" about the way in which she wrote her memos, although he did not ask her to rewrite the Crown Oaks memo. This evidence demonstrates that Montague read Moczygemba's memo, and was therefore aware that the liens appeared on the closing statements. Although it is admittedly a closer question than in the case of Pettigrew, when viewed in the light most favorable to the verdict, the evidence of Montague's extensive knowledge of the transactions, the letters to Hays, and his statement to Moczygemba regarding the McPherson Park transaction constitute sufficient evidence from which a rational juror could conclude that Montague possessed the necessary intent.

Montague also argues that there was insufficient evidence that including the sham liens on the sellers' statements constituted "material" false statements. We held in *Beuttenmuller* that a "material fact" under section 1006 is one "'hav[ing] a natural tendency to influence, or be[ing] capable of affecting or influencing, a government function.'" *Beuttenmuller*, 29 F.3d at 982 (*quoting United States v. Swain*, 757 F.2d 1530, 1534 (5th Cir.), *cert. denied*, 106 S.Ct. 81 (1985)(construing 18 U.S.C. § 1001)). The listing of the sham liens on the sellers' statements was clearly a necessary step in evading the net worth requirements imposed on VSA as they disguised the fact that VSA was actually the source of the funds used to purchase its own REO, which allowed VSA to book the transaction as a sale. Although the section 1006

convictions must be reversed and remanded for new trial due to the failure to instruct the jury regarding materiality, we conclude that there is sufficient evidence of materiality had the issue been properly submitted.

C.  Walker

While mindful of the deference due a jury verdict, we are unable to conclude that there is sufficient evidence in the record before us that Walker possessed the necessary intent to support his conviction under 18 U.S.C. §§ 1006 and 1344(a)(1).  The government asks us to rely primarily on evidence that:  (1) Walker acted as trustee in the White's Branch property and negotiated the sham lien; and (2) Walker was a "close associate" of Pettigrew's and often dealt with financial institutions.  However, the fact that Walker acted as trustee for the White's Branch transaction and helped to create the sham lien is not alone sufficient to establish intent to defraud VSA or deceive federal examiners.[22]  However, a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attentuated piling of inference on inference.  *See, e.g., United States v. Menesses*, 962 F.2d 420, 427 (5th Cir. 1992).  While the issue is a close one, we are simply unable to  say that a rational juror could have found Walker possessed the necessary intent beyond a reasonable doubt based upon the record evidence.

D.  Powell

1.  False Entry Counts

---

[22]  We note that the trustees in the other transactions were either not indicted or acquitted on all counts.

34

Powell launches a three-pronged attack on the sufficiency of the evidence to support each of his convictions under section 1006. Powell urges that in each instance there is insufficient evidence that: (1) the entries were false; (2) Powell was aware of their falsity; and (2) Powell made the entries or caused them to be made.

With respect to the false entry count relating to the Barthold Road committee loan application (Count 3), Powell first argues that there was insufficient evidence of the falsity of the statement that the purpose of the loan was "to refinance property." However, there is evidence that the Barthold Road loan was conditioned on the agreement of Pitzer and Collins to purchase the Cheyenne Plaza and Frankford Square properties. The omission of material information may constitute a false entry under section 1006. *United States v. Baker*, 61 F.3d 317, 323 (5th Cir. 1995). Furthermore, Pitzer testified that Powell was aware of the structure of the transaction. Therefore, the evidence that Powell signed the committee loan application despite his knowledge that it omitted material information is sufficient to support his conviction on Count Three.

Powell raises the same arguments with respect to the false entry counts relating to the committee loan applications for the Cheyenne Plaza and Frankford Square loans (Counts 4, 5). The committee loan applications indicated that the borrower, Proformance, was to make the downpayments on the Cheyenne Plaza and Frankford Square properties. Powell does not dispute that the funds used to purchase these properties came from the VSA loan to

35

Pitzer and Collins related to the Barthold Road property. The evidence supports the jury's apparent conclusion that Proformance was utilized as the borrower to disguise the link between the loan to Pitzer and Collins, and the purchase of the REO. The entry reflecting that the funds belonged to Proformance was therefore false in that it misrepresented the true source of the funds. Given the evidence that Powell was aware of the structure of the Barthold Road transaction and nonetheless signed the committee loan application, there was sufficient evidence to support his conviction under section 1006.

Powell challenges the sufficiency of the evidence to support his conviction for false entry relating to the Bloomdale Road loan (Count 8) on the same grounds. The committee loan application listed the purpose of the loan as being: "To provide funds to purchase approximately 156.264 acres in McKinney, Texas zoned for residential and retail use." Powell's own testimony establishes that he was aware that the funds were being used for other purposes as well as indicating that he believed the funds were to be used as detailed in a document prepared by VSA employee Janine Radke that reflected other purposes for the loan proceeds. Therefore, there was sufficient evidence of a material omission, that Powell was aware of such omission, and that he aided and abetted the making of the false entry by affixing his signature to the loan committee application.

Although providing extremely limited argument on this point, Powell asserts that there was insufficient evidence to support his

false entry conviction in connection with the Irving/River Run transaction (Count 11). Powell acknowledges that the committee loan application did not reflect that part of the loan proceeds were to be used by Pettigrew to purchase the River Run property. However, he argues that the entry was literally true, and even if false, there is no evidence that Powell was aware of its falsity.

Powell's argument that the statement contained in the committee loan application was not false is without merit. The omission of the relationship between the sale of the Irving property and the River Run purchase is clearly material.

Powell acknowledges that he located Bohn and Baer to purchase the Irving property, and Bohn testified that Powell was involved in negotiating the terms of the transaction. Both Bohn and Baer indicated that after closing the Irving transaction they realized that River Run was linked to the Irving transaction. Baer indicated that this connection was reflected in a trust agreement signed by Bohn involving River Run, which was included among the documents. Given Powell's involvement in the transaction, the jury could rationally conclude that Powell was aware of the transaction's connection to River Run as well, and thus of the material omission from the committee loan application.

Powell next contests the sufficiency of the evidence to support his conviction on the false entry count relating to the McPherson Park transaction (Count 22). The committee loan application for the McPherson Park transaction stated that the purpose of the loan was "[a]cquisition and development" of the Luck

37

Field property. However, the evidence indicates that some of the loan proceeds were to be reinvested in VSA although the parties could ultimately not agree as to the manner in which this was to be done. There was some evidence Powell was present at a meeting involving the structuring of the McPherson Park transaction from which the jury could reasonably infer that Powell was aware of the details of the transaction. Again, Powell signed the committee loan application despite such knowledge, and in so doing contributed to the making of the false entry.

2. Sharing in Proceeds of Loans

"In order to convict a defendant of improper participation in bank transactions under section 1006, the government must demonstrate: (1) the defendant's connection with the protected institution; (2) direct or indirect receipt of some benefit from a bank transaction; and (3) intent to defraud." *United States v. Brechtel*, 997 F.2d 1108, 1115 (5th Cir. 1993). The government may prove intent by circumstantial evidence, *id*. at 1116, and "[a]n inference of intent to defraud arises where a responsible bank insider acts to procure a transaction which he knows will benefit him, without disclosing his interest therein." *Id*.

Powell raises two arguments with respect to his conviction for aiding and abetting Hays' sharing in the proceeds of the Bloomdale Road loan in violation of section 1006. The first of these arguments actually raises a question of statutory construction despite being couched as a sufficiency point, in which Powell maintains that the connection between the Bloomdale Road loan and

38

the purchase of Hays' share of the Fall Creek Ranch is too attenuated to constitute "participation" by Hays in the proceeds of a VSA loan. To briefly recap the details of the transaction, Powell purchased Hays' share of the Fall Creek Ranch with the proceeds of a sale of a partial interest in the Fall Creek Ranch venture to Pitzer and Collins. Pitzer and Collins purchased that property with a loan from Union Bank, which was collateralized by CDS purchased with the proceeds of the Bloomdale Road loan.

Powell contends that the relationship between the Bloomdale Road loan and the purchase of Hays' interest in the Fall Creek Ranch is simply too remote. We cannot agree. The statute expressly prohibits an officer of a federal credit institution from "participat[ing] or shar[ing] in or receiv[ing] *directly or indirectly* any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such corporation, institution, or association . . . ." 18 U.S.C. § 1006 (emphasis added). While there will be some point at which such a relationship becomes too remote, that point has not been reached in the present case. To so hold would encourage the structuring of transactions to evade the grasp of the statute.

Although Powell does include a citation to the record, Powell's other sufficiency argument as to this count consists of one sentence in which he maintains that Pitzer told him that the money to purchase the share in the Fall Creek venture was coming from a loan secured by Pitzer and Collins's interest in "the

39

property."[23]  We understand this argument to be that Powell lacked the necessary intent to aid and abet Hays in the commission of the offense.  We conclude that a rational juror could have reached the conclusion that Powell was aware of the source of the funds.

Powell also challenges the sufficiency of the evidence to

---

[23]  Pitzer testified upon cross-examination by Powell's counsel:

> "A:  Well, at the time I was on the advisory board of the bank [Union Bank], and the bank was always looking for real estate loans, or good loans for the bank, and I had suggested that we make a loan for our interest in the Fall Creek Ranch.  And that we collateralized that with the CD's . . . .
> Q:  Okay.  And so this was new money that you borrowed from Union Bank, that you sent to the Charles Schreiner Bank?  Money you borrowed on that note?
> A:  That's correct.
> Q:  What happened to that money that came from Victoria?  Those CD's?
> A:  They were collateral for the note.
> Q:  Okay.  Why didn't you just use the money from Victoria to -- why --
> A:  We decided we could just get a short term loan from the bank, and [sic] helps us show performance with the bank, to have a note, and then pay it off in pretty short period of time.
> Q:  Did you talk this over with Chad Powell, that you were going to do this?
> A:  I believe we told him what we were doing.
> Q:  What did you tell him?
> A:  Make sure that they were -- if they were okay with that.
> Q:  Okay.
> A:  And there was no problem on their side.
> Q:  What did you tell them?
> A:  We told them what we were going to do, and they said that sounded fine.
> Q:  What did you tell them you were going to do?
> A:  That we were going to borrow money from Union Bank, and it was going to be collateralized by our interest in the property."

support his conviction for aiding and abetting Hays' receipt of the benefits of the VSA Royston loans in violation of the insider participation provision of section 1006. Powell acknowledges that he borrowed money from VSA after he was no longer an officer there, and that the loan proceeds were used to pay the interest and principal on the Santexco note at First City Bank on which Rupert Hays was still a guarantor.

Powell first maintains that Hays received no benefit as he no longer possessed an interest in the underlying collateral. However, the government correctly notes that the benefit which accrued to Hays through Powell's payment of the note was not having to perform on his guarantee. Such a benefit, although indirect, is sufficient under the insider participation provision of section 1006. *See Brechtel*, 997 F.2d at 1115.

Powell's only other argument that merits passing attention is that there was insufficient evidence that he knew that Hays had failed to disclose his guarantor status on the Santexco note. This contention is rebutted by the testimony of Al Bond, who serviced the note at First City, that Powell had "made a comment that Mr. Hays was sensitive to the fact that he was a guarantor on this loan, and he was trying to help obtain, or was trying to work with Chad [Powell] in providing financing at Victoria Savings, and that there could be [the] appearance of conflict," and that Hays "did not want to acknowledge or sign any of the extension or renewal documents because of that." In the present context, a rational juror could infer from this testimony that Powell was aware that

41

Hays had not disclosed his guarantor status on the Santexco note.

### 3. Misapplication

Powell also argues that there was insufficient evidence to support his conviction for aiding and abetting the willful misapplication of VSA funds in violation of 18 U.S.C. § 657. In order to establish an offense under section 657, the government must "prove that (1) the defendant was an officer, agent or employee of, or connected in some way with, a federally insured savings and loan association, (2) he willfully misapplied funds of the association, and (3) he acted with intent to injure or defraud the association." *Faulkner*, 17 F.3d at 771; *United States v. Tullos*, 868 F.2d 689,693(5th Cir.)*, cert. denied*, 109 S.Ct. 3171(1989). In order to establish Powell's liability as an accomplice, the government needed to establish that Powell "'associated with a criminal venture, participated in the venture, and sought by his action to make the venture succeed.'" *United States v. Parekh*, 926 F.2d 402, 406 (5th Cir. 1991) (*quoting United States v. Holcomb*, 797 F.2d 1320, 1328 (5th Cir. 1986), *cert. denied*, 108 S.Ct. 354 (1987)).

Powell's attack on the sufficiency of the evidence consists of three points: (1) there was insufficient evidence that the Barthold Road loan was "overfunded;" (2) there was insufficient evidence that Proformance was not a creditworthy borrower, thus negating any intent to injure or defraud VSA; and (3) evidence that the loan was intended to induce the Barthold Road borrowers to take out the loan was not illegal, and therefore, was not evidence of

42

misapplication.

However, these arguments fail to counter the evidence introduced by the government. It is undisputed that Powell was an officer of VSA. Furthermore, there was evidence that Powell signed committee loan applications that failed to fully disclose the purpose of the loans, thereby assisting Hays in evading net worth requirements by disguising the fact the REO purchases were funded by VSA. Assisting Hays in evading the net worth requirements both exposed VSA and its officials to potential governmental sanctions and potentially undermined the financial stability of the institution, therefore constituting sufficient evidence of intent to harm VSA. *See Parekh*, 926 F.2d at 908. In short, the evidence was such that a rational trier of fact could have found Powell guilty of all elements of the offense beyond a reasonable doubt.

4. Bank Fraud

Powell also challenges the sufficiency of the evidence to support his convictions for bank fraud under section 1344(a)(1) in Counts Seven and Ten. Powell's argument in both instances turns primarily on whether there was sufficient evidence that the Bloomdale Road and Irving/River Run loans were overfunded, and whether VSA funds were used to reduce the personal debts of Hays and Powell and finance the River Run purchase. There was sufficient record evidence from which a rational juror could conclude that the loans were overfunded in order to disguise the use of VSA funds to benefit Powell and Hays and to evade the net

worth requirements imposed on VSA.[24]

## V. Conclusion

In summary, we reverse the false entry convictions of Pettigrew (Counts 12, 23, 24), Montague (Counts 12, 23, 24) and Powell (Counts 3, 4, 5, 8, 11, 22) due to the trial court's failure to properly instruct the jury on materiality under section 1006. This instructional error also requires that we reverse the convictions of Pettigrew and Powell under section 371 for conspiracy to commit offenses against the United States (Count 36). These counts are all remanded for another trial.

With respect to Pettigrew, we also reverse and remand for another trial his money laundering conviction under section 1957 for instructional error (Count 35), while affirming his convictions for bank fraud under section 1344(a)(1) (Counts 10, 21) and conspiracy to defraud the United States of the lawful government functions of an agency under section 371 (Count 1). Pettigrew's sentence on Counts 1, 10, and 21 is vacated and as to him the cause is remanded for resentencing on such counts.

We affirm the remainder of Powell's convictions for conspiracy

---

[24] Powell's sole remaining sufficiency point urges us to reverse his conviction on the conspiracy counts because: "None of the actions proved by the Government to have been taken or agreed to by Powell were illegal. Thus, the conspiracy Counts must fail, because the objects of the conspiracies were not illegal. *Beuttenmuller*, at 5."

Although Powell's conspiracy conviction on Count 36 has been reversed due to instructional error, we decline to address this point as it relates to Count 1 as it fails to comply with the requirements of Fed. R. App. P. 28(a)(4). *United States v. Abroms*, 947 F.2d 1241, 1250 (5th Cir. 1991), *cert. denied*, 112 S.Ct. 2992 (1992).

to defraud the United States of the lawful government functions of an agency under section 371 (Count 1), misapplication under section 657 (Count 2), bank fraud under section 1344(a)(1), and aiding and abetting insider participation in the benefits of a federal credit institution under section 1006 (Counts 13, 15, 16, 17, 19). Powell's sentence on Counts 1, 2, 13, 15, 16, 17, and 19 is vacated and as to him the cause is remanded for resentencing on such counts.

We further affirm Montague's convictions for bank fraud under section 1344(a)(1) (Counts 10, 21); his sentence on Counts 10 and 21 is vacated and the cause as to him is remanded for resentencing on such counts. However, Walker's convictions for bank fraud under section 1344(a)(1) and false entry under section 1006 (Count 24) must be reversed for insufficiency of the evidence, and such counts as to Walker shall be dismissed.[25]

Accordingly, the judgment of the district court is

> AFFIRMED in part; REVERSED in part;
> REVERSED and REMANDED in part; and
> VACATED and REMANDED in part.

---

[25] The motion of Pettigrew and Montague to cross-adopt the argument found at pages 16 through 19 of Powell's brief previously carried with the case is hereby granted, as is the motion of Walker to adopt Part III of the reply brief of Montague and Part VI of the reply brief of Pettigrew.

45