COURT OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-161-CR

 

 

CAROLIN HIGHT TEAGUE                                                                   APPELLANT

 

                                                             V.

 

THE STATE OF TEXAS                                                                                STATE

 

                                                       ------------

 

                  FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                                      OPINION

 

                                                       ------------








Appellant Carolin Hight Teague was charged by
indictment with  tampering with a
governmental record and aggravated perjury. 
The jury acquitted Appellant of tampering with a governmental record and
convicted her of aggravated perjury.  The
trial court sentenced her to ten years=
confinement in the Institutional Division of the Texas Department of Criminal
Justice and a $5,000 fine.  The trial
judge suspended imposition of confinement and placed her on community
supervision for ten years.

Appellant brings seven issues on appeal,
arguing that the evidence is legally and factually insufficient to support the
verdict and that the trial court erred by admitting inadmissible hearsay and
instructing the jury on materiality.  For
the reasons stated below, we affirm the trial court=s
judgment.

Statement of Facts

On November 23, 2002, Gayla Beth Dodson was
working as a dispatcher for the Young County Sheriff's Department, which
provides dispatch services to the Graham Police Department.  Graham police officer Michael Viehmann, who
worked the 3:00 p.m.B11:00 p.m. shift, attempted to
contact the dispatcher several times while on patrol.  Dodson responded slowly initially and
eventually did not respond at all.  After
Viehmann told another officer over the radio that dispatch was not responding
to him, Dodson immediately told Viehmann to come into the Young County
Sheriff's office.  Viehmann had been
talked to by his supervisor in the past about having problems with other
dispatchers, so he had turned on his car's video and audio recording system
before talking to Dodson.








At dispatch, Dodson confronted Viehmann about
what he had said over the radio. 
Viehmann called his supervisor, Assistant Chief Tony Widner, and told
him about the problem.  Dodson also spoke
with Widner at that time.  The 911 system
was set up to record all radio traffic in addition to incoming 911 calls, and
both Viehmann and Widner requested a copy of the radio traffic recording from
that evening.

Widner started an internal affairs
investigation the next working day in response to the incident.  In the course of that investigation, Viehmann
made a written statement and turned over the recording that he had made.  As for the 911 tape, Widner declined to go to
dispatch and listen to the original dispatch tape there; he instead again
requested a copy.  At some point when he
called the sheriff=s office for a copy, he heard
Dodson in the background say, AIf he
wants to listen to the tape, he can come over here and listen to it.@  When Widner did not receive any tape from
Dodson, he called to ask Sheriff Pettus about getting a copy of the tape; he
was told by dispatcher Teresa McGehee that the copy had been made and that the
sheriff had it.  Pettus personally handed
the tape to Widner.








The tape was about two or three minutes long
and did not include all the traffic stops that were recorded on Viehmann=s
in-car camera.  After discussing the tape
with his chief, Jim Nance, Widner asked Pettus to watch Viehmann=s
videotape.  At trial, Widner testified
that after seeing and listening to the tape, Pettus stated, AI
guess I didn=t get the whole story,@ and AI
guess I have been lied to.@  The internal affairs investigation into
Viehmann=s
conduct was closed. The tape used by Viehmann was put back into rotation to be
re-used.

In 2004, Viehmann discussed the events with
Texas Ranger Aaron Dwayne Williams while the two were having lunch.  Williams then began an investigation into the
incident.  He presented his findings to
the Young County grand jury.  The grand
jury heard testimony from Richard Ferguson, a Graham police officer, that he
had heard the radio conversations between Dodson and Viehmann, and that a
couple of days later, he saw Dodson and Appellant at dispatch with a tape
recorder hooked up to the 911 system, taping an edited copy of what was playing
on the system.  Ferguson recognized what
he heard as the events of November 23. 
Ferguson gave this same testimony at trial.

The tape used by Viehmann was turned over to
Williams, but by then it had already been taped over.  In February 2003, the 911 system had been
replaced, and the old system had been put into a storage room.  In April 2004, Jan Hammond, the IT
administrator for Young County, was asked to locate the old system and the
tapes that had been used with it.  She
found the machine in Chief Deputy Gary Barnett=s
office on the floor.  The top had been taken
off of the machine, and it looked to Hammond as though it had been pried off.








Hammond found the tapes on a shelf in the
storage room.  That machine recorded on
two tapes simultaneouslyCan AA@ tape
and a AB@
tape.  The AA@ tape
from November 2002 had Abad@
written on it and had been erased.  The AB@ tape
was turned over to Williams.

Dodson testified to the grand jury that on the
night of the confrontation with Viehmann, she called Appellant, another
employee of the Young County Sheriff=s
office, because she was upset, and Appellant came to the station. Dodson
further testified that she did not remember anyone asking for a copy of a tape,
if anyone had asked her to make a tape, she would have asked someone else to do
it because she did not know how to make a copy, she did not make a copy of a
tape and did not remember assisting anyone to do so, and she did not know who
made the tape.  She also stated that she
did not erase the original 911 tape and did not know who did.  Her grand jury testimony was read to the jury
at trial.








Appellant testified to the grand jury that on
November 23, 2002, she was assigned to the patrol division but was not working
that day.  After receiving a call from
Dodson that night, she ran dispatch for Dodson, who was upset.  Appellant testified that she did not make the
recording, did not assist in making the recording, and was not present when it
was made.  She testified that she would
not call Ferguson a liar, that "[i]f he said he saw [her] making [the tape],
then evidently [she] was," but she did not remember making the tape.  She also stated that she did not erase the
original 911 tape.  Her grand jury
testimony was read to the jury at trial.

At trial, four people who had worked with
Ferguson, including Ferguson's supervisor, testified that Ferguson's reputation
in the community for truth and veracity was bad.

Legal Sufficiency of
the Evidence Under Article 38.18








Appellant
argues in her second issue that the evidence is legally insufficient under
article 38.18 of the code of criminal procedure to support the verdict.  Article 38.18(a) provides that A[n]o
person may be convicted of perjury or aggravated perjury if proof that [her]
statement is false rests solely upon the testimony of one witness other than
the defendant.@[1]  Appellant argues that article 38.18 is
controlled by article 38.17, which provides, AIn all
cases where, by law, two witnesses, or one with corroborating circumstances,
are required to authorize a conviction, if the requirement be not fulfilled,
the court shall instruct the jury to render a verdict of acquittal, and they
are bound by the instruction.@[2]  The State argues that article 38.18 is merely
Aa
statutorily imposed sufficiency review and is not derived from federal or state
constitutional principles that define the legal and factual sufficiency
standards,@ much like the accomplice
witness rule.[3]  The State is only partially correct.  The accomplice witness rule specifically
states that in addition to an accomplice witness=s
testimony, there must be evidence tending to connect the defendant to the
offense.[4]  The accomplice witness rule is not a true
sufficiency test; it merely instructs in the determination of sufficiency.  That is, the accomplice witness=s
testimony must be disregarded in determining whether there is other evidence
tending to connect the defendant to the offense.[5]  The additional evidence does not have to be
legally or factually sufficient to sustain the conviction.[6]  It need only tend to connect the defendant to
the offense.[7]  








Article
38.18 is slightly different.  It
instructs that there must be more than a single witness=s
testimony.  To sustain a conviction for
perjury or aggravated perjury, the State must produce more evidence than the
testimony of the defendant and another witness.[8]  But there is no corroboration requirement.[9]

The
State produced the testimony of Richard Ferguson.  In addition, as the State points out, it
offered Appellant=s grand jury testimony, and
that of Dodson, Aincluding their vacillating
and implausible testimony and sudden loss of memory after being confronted with
the fact that Ferguson claimed to have seen them making the record, which the
grand jurors themselves apparently found to be incredible.@  The State also points to testimony from
multiple witnesses that Dodson and Appellant were together in the dispatch
office that Saturday night after Widner had requested a copy of the 911 tape,
as well as evidence from the B tape that Widner had made the request and that
Dodson had told the sheriff about it.  








Additionally,
the State relies on testimony that both Appellant and Dodson attempted to shift
the blame to another dispatcher and testimony regarding the B tape and its
contents that proved that Dodson had testified untruthfully about other aspects
of the night=s events.  The State also directs us to testimony from
Ranger Williams and from the defense expert that corroborated the background
voices on the tape, one of which Williams testified he recognized as Ferguson=s.  The State also points to testimony from
multiple witnesses that Dodson was essentially the instigator of the initial
dispute and had motive to alter the tape to make herself look better and shift
blame to Viehmann, Appellant was Dodson=s good
friend, the two of them had the opportunity to make the cassette tape that
Saturday night, and the tape appeared in the sheriff=s
office on Monday morning.  

The
State argues that the jury was able to consider the entirety of the evidence
and compare Appellant=s and Dodson=s
testimony and their similar losses of memory, their demeanor, and their grand
jury testimony.  We hold that the
evidence recited above is sufficient to satisfy article 38.18.  We therefore overrule Appellant=s
second issue.  

Sufficiency of the Evidence of Intent to Deceive

In her
third issue, Appellant contends that the evidence is legally insufficient to
support the verdict.  In her fourth
issue, she contends that the evidence is factually insufficient to support the
verdict.  Specifically, Appellant
contends that the evidence is legally and factually insufficient to show that
she had the intent to deceive.  Section
37.03 of the penal code provides,








(a) A person commits an
offense, [aggravated perjury], if he commits perjury as defined in Section
37.02, and the false statement:

 

(1) is made during or
in connection with an official proceeding; 
and

 

(2) is material.[10]

Section
37.02 provides,

(a) A person commits an
offense if, with intent to deceive and with knowledge of the statement's
meaning:

 

(1) he makes a false
statement under oath or swears to the truth of a false statement previously
made and the statement is required or authorized by law to be made under oath.[11]


 








Dodson
testified that she did not make the tape, she did not know how to use the
equipment, she knew nothing about the original 911 tape being erased, she had
told the sheriff that she did not remember making a copy of the 911 tape, and
if she had anything to do with making a copy of the tape, she did not remember
it.  She also testified that she could
not dispute Ferguson=s testimony that he saw her
with Appellant making the tape because she did not remember it.  Dodson denied telling the sheriff that Widner
had asked for a copy of the 911 tape, but she admitted that if the tape showed
that she had done so, then it did in fact happen.  When asked if she had ever listened to the
real 911 tape after the night in question, or on that night, Dodson responded, ANot
that I know of.@  When the prosecutor admonished her that false
testimony could lead to an aggravated perjury charge and explained to her the
defense of retraction, she stated, AI do
not remember making that tape with [Appellant]. 
I did not make the tape by myself. 
I called the sheriff to tell him that I threw a fit.@

Appellant
testified that, A[I]f you have my name and
initials on that tape then I probably did [assist in making the tape].  I don=t
remember making it is what I=m
telling you.@  She also explained that she did not think
that any of that was important at the time. 
Finally, when a grand juror asked her if she had heard Dodson telling
Sheriff Pettus that night that Widner had requested a copy of the tape,
Appellant stated, AShe did?  Okay. 
Then maybe she made it that night.@

Marsha
Sumpter, the 911 coordinator for Young County, testified that Dodson was the
person who had a fight with Viehmann and that both she and Appellant knew how
to operate the logger machine.  Sumpter
listened to the November 25, 2002, transmissions and heard Widner call in and
ask for taped copies again.  She also
heard Teresa McGehee call back about ten minutes later and tell Widner that the
tape had been made.  Sumpter testified
that you should not be able to copy a tape of twenty-eight minutes of activity
in ten minutes.








The
defense expert forensic tape examiner, Al Yonovitz, opined that he did not
believe that the tape had been maliciously changed.  He did agree, however, that State=s
exhibit 1A, the cassette tape, did not reflect everything in the 911
transmissions for November 23, 2002, from 5:30-6:00 p.m. and again from
6:27-6:30 p.m.

As the
State points out, in a prosecution for aggravated perjury, intent to deceive
may be inferred from the circumstances.[12]  The State argues that the jury could consider
Appellant=s grand jury testimony in
light of all the other evidence including their knowledge of her background as
an officer and the likelihood that she had testified before.  They were free to take into account the fact
that she did not experience memory problems until Ferguson was discussed as an
eyewitness.  They were also free to
consider as suspicious her repeated assertions that her name would be written
on the tape had she recorded it and her reaction of Asudden
and selective memory loss@ to the news that Ferguson had
implicated her, which was strangely similar to Dodson=s
sudden and selective memory loss.








Applying
the proper standards of review,[13]
we hold the evidence legally and factually sufficient to prove Appellant=s
intent to deceive.  We overrule Appellant=s
third and fourth issues.

Defense of Retraction

In her fifth and sixth issues, Appellant argues that the evidence
is legally and factually insufficient to disprove the defense of
retraction.  Section 37.05 of the penal code
provides,

It is a
defense to prosecution under Section 37.03 (Aggravated Perjury) that the actor
retracted his false statement:

 

(1) before
completion of the testimony at the official proceeding;  and

 

(2) before it
became manifest that the falsity of the statement would be exposed.[14]

 








When interpreting a statute, we look to the literal text for its
meaning, and we ordinarily give effect to that plain meaning.[15]  The only exceptions to this rule are where
application of the statute's plain language would lead to absurd consequences
that the Texas Legislature could not possibly have intended, or if the plain
language is ambiguous.[16] 

The plain language of this statute required Appellant to retract
the statement before the completion of her testimony and before it became
manifest that the falsity of the statement would be exposed.[17]  Retract means to draw back, take back,
withdraw, disavow, or recant.[18]  We have carefully examined the record and
find no place in which Appellant retracted the testimony at issue; a lack of
recollection is not a retraction. 
Applying the proper standards of review for legal[19] and
factual[20]
sufficiency of the evidence disproving the defense, we hold that the evidence
is legally and factually sufficient to disprove the defense of retraction.  We overrule Appellant=s fifth and sixth issues.

Admissibility of Hearsay








In her
first issue, Appellant argues that the trial court erred in admitting over
objection a hearsay statement of Sheriff Pettus, who did not testify at
trial.  We have carefully examined the
record.  Assistant Chief Widner and Jim
Nance were allowed to testify over Appellant=s
hearsay objection that, at the meeting they had with Sheriff Pettus, after
listening to the cassette tape, Pettus stated, AI
guess I=ve
been lied to.@  As Appellant argues, the statement is clearly
hearsay.  The State conceded at trial
that the statement was hearsay by offering it as an exception to the
prohibition against hearsay evidence. 
The State offered the statement as a present sense impression, evidence
of then existing mental or emotional state, and an excited utterance.[21]








The
statement satisfies none of those exceptions. The State argues that Appellant
failed to preserve this complaint. 
Appellant did not object after the first time the statement was
offered.  Instead, she objected earlier,
in the middle of the statement. The witness testified that the sheriff said, AI
guess I didn=t get the whole story.  I guessC.@  Appellant objected on
hearsay grounds, her objection was overruled, and she requested a limiting
instruction.  Afterward, the rest of the
statement came in without additional objection. 
Under the facts of this case, we hold that the objection made
mid-sentence also applied to the rest of the statement that was admitted after
the objection.        Appellant also
timely objected the second time the statement was made.  But Appellant did not object to the third
mention of the statement.  Because
Appellant did not object to the third admission of the statement, she has not
preserved error.[22]  We overrule Appellant=s first issue.

Charge Error

In her
seventh issue, Appellant contends that the trial court improperly instructed
the jury that the statement in question, if any, made by Appellant, if it was
made, would be material.  Appellant
argues that because materiality is an element of the offense,[23]
an instruction that the statement in question was material instructed the jury
on an element to be determined by the jury and that the instruction therefore
violated Appellant=s right to due process under
the Constitution of the United States. 
We note that section 37.04(c) of the penal code provides that
materiality is a question of law.[24]  But, as Appellant points out, the United
States Supreme Court has held that whether a statement is material must be
submitted to the jury.[25]









The
case before this court is distinguishable in part from Gaudin because
Appellant=s jury was instructed in the
application paragraph that it must determine the materiality of the
statement.  But the jury was also instructed
that the statement under consideration was, in fact, material and that the only
issue was whether Appellant had made the statement.  We therefore hold that the charge was
erroneous.  

Appellant
timely objected to this error, so we must determine whether Appellant suffered
any harm from the improper instruction.[26]  A properly preserved
error will require reversal as long as the error is not harmless.[27]  In making this determination, Athe actual degree of harm must be assayed in light of the entire
jury charge, the state of the evidence, including the contested issues and
weight of probative evidence, the argument of counsel and any other relevant
information revealed by the record of the trial as a whole.@[28]








Appellant
argues that reversal is mandated by the Fifth Circuit decision in U.S. v.
Pettigrew.[29]  Pettigrew addressed the complete
withholding of the issue of materiality from the jury, resulting in the jury=s
rendering no verdict as to that element of the offense.[30]  In the case now before this court, however,
the jury did render a verdict as to the materiality element.  But the jury was instructed to render that
verdict if they found Appellant had made the statement in question.

The
State argues that materiality was never an issue in the case.  Materiality was unchallenged and
uncontested.  Based on our review of the
record, we agree.  Because materiality
was never an issue in this case, we hold, under the limited and unique facts of
this case, that Appellant suffered no harm from the erroneous instruction.  Accordingly, we overrule Appellant=s
seventh issue.

Conclusion

Having
overruled Appellant=s seven issues, we affirm the
trial court=s judgment.

 

LEE ANN DAUPHINOT

JUSTICE

PANEL:  CAYCE, C.J.; DAUPHINOT and MCCOY, JJ.

    CAYCE, C.J. concurs without opinion.








PUBLISH

DELIVERED:
August 21, 2008











[1]TEX. CODE CRIM. PROC. ANN. art. 38.18(a) (Vernon 2005).





[2]See id. art. 38.17.





[3]Cathey v. State,
992 S.W.2d 460, 462B63 (Tex. Crim. App. 1999), cert. denied, 528
U.S. 1082 (2000).





[4]Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).





[5]Solomon v. State, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001).





[6]Id.





[7]Id.





[8]Tex. Code Crim. Proc. Ann. art. 38.18.





[9]See id.; see also Martin v. State, 13 S.W.3d 133, 140 (Tex. App.CDallas
2000, no pet.); Tamayo v. State, 924 S.W.2d 213, 216 n.1 (Tex. App.CBeaumont
1996, no pet.).





[10]Tex. Penal Code Ann. ' 37.03 (Vernon 2003).





[11]Id. ' 37.02.





[12]Bodmer v. State,
161 S.W.3d 9, 12 (Tex. App.CHouston [14th Dist.] 2004, no pet.).





[13]See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton
v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (both providing legal
sufficiency standard of review); Watson v. State, 204 S.W.3d 404, 414
(Tex. Crim. App. 2006); Drichas v. State, 175 S.W.3d 795, 799 (Tex.
Crim. App. 2005); Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App.
2003); Johnson, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000) (all providing
factual sufficiency standard of review).





[14]Tex. Penal Code Ann. ' 37.05 (Vernon 2003).





[15]Boykin v. State,
818 S.W.2d 782, 785 (Tex. Crim. App. 1991). 






[16]Id.





[17]Tex. Penal Code Ann. ' 37.05.





[18]Merriam-Webster Online
Dictionary 2008,
http://www.merriam-webster.com/dictionary/retract (last visited August 21,
2008).





[19]See Zuliani v. State, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); Saxton v. State,
804 S.W.2d 910, 913B14 (Tex. Crim. App. 1991).





[20]See Watson,
204 S.W.3d at 414; Zuliani, 97 S.W.3d at 595.





[21]See Tex. R. Evid. 803(1), (2), (3).





[22]See Fuentes v. State, 991 S.W.2d 267, 273 (Tex. Crim. App.), cert. denied, 528 U.S.
1026 (1999); Leday v. State, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998);
Ethington v. State, 819 S.W.2d 854, 858B59 (Tex. Crim. App. 1991). 





[23]See TEX. PENAL CODE ANN. ' 37.04
(Vernon 2003).





[24]Id. '
37.04(c).





[25]United States v. Gaudin, 515 U.S. 506, 522B23, 115 S. Ct. 2310, 2320 (1995)
(holding refusal to submit issue of materiality to jury unconstitutional); see
also Ward v. State, 938 S.W.2d 525, 530 (Tex. App.CTexarkana 1997, pet. ref'd) (noting
that section 37.04(c) is most likely not good law after Gaudin).





[26]See Almanza v. State, 686 S.W.2d 157, 171
(Tex. Crim. App. 1984) (op. on reh=g).





[27]Id.





[28]Id.; see
also Ovalle v. State, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).





[29]77 F.3d 1500 (5th Cir. 1996). 





[30]Id. at 1511.