

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 2-07-161-CR

CAROLIN HIGHT TEAGUE                                      APPELLANT

V.

THE STATE OF TEXAS                                            STATE

------------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

Appellant Carolin Hight Teague was charged by indictment with tampering with a governmental record and aggravated perjury. The jury acquitted Appellant of tampering with a governmental record and convicted her of aggravated perjury. The trial court sentenced her to ten years' confinement in the Institutional Division of the Texas Department of Criminal Justice and a

$5,000 fine. The trial judge suspended imposition of confinement and placed her on community supervision for ten years.

Appellant brings seven issues on appeal, arguing that the evidence is legally and factually insufficient to support the verdict and that the trial court erred by admitting inadmissible hearsay and instructing the jury on materiality. For the reasons stated below, we affirm the trial court's judgment.

### STATEMENT OF FACTS

On November 23, 2002, Gayla Beth Dodson was working as a dispatcher for the Young County Sheriff's Department, which provides dispatch services to the Graham Police Department. Graham police officer Michael Viehmann, who worked the 3:00 p.m.–11:00 p.m. shift, attempted to contact the dispatcher several times while on patrol. Dodson responded slowly initially and eventually did not respond at all. After Viehmann told another officer over the radio that dispatch was not responding to him, Dodson immediately told Viehmann to come into the Young County Sheriff's office. Viehmann had been talked to by his supervisor in the past about having problems with other dispatchers, so he had turned on his car's video and audio recording system before talking to Dodson.

At dispatch, Dodson confronted Viehmann about what he had said over the radio. Viehmann called his supervisor, Assistant Chief Tony Widner, and

2

told him about the problem. Dodson also spoke with Widner at that time. The 911 system was set up to record all radio traffic in addition to incoming 911 calls, and both Viehmann and Widner requested a copy of the radio traffic recording from that evening.

Widner started an internal affairs investigation the next working day in response to the incident. In the course of that investigation, Viehmann made a written statement and turned over the recording that he had made. As for the 911 tape, Widner declined to go to dispatch and listen to the original dispatch tape there; he instead again requested a copy. At some point when he called the sheriff's office for a copy, he heard Dodson in the background say, "If he wants to listen to the tape, he can come over here and listen to it." When Widner did not receive any tape from Dodson, he called to ask Sheriff Pettus about getting a copy of the tape; he was told by dispatcher Teresa McGehee that the copy had been made and that the sheriff had it. Pettus personally handed the tape to Widner.

The tape was about two or three minutes long and did not include all the traffic stops that were recorded on Viehmann's in-car camera. After discussing the tape with his chief, Jim Nance, Widner asked Pettus to watch Viehmann's videotape. At trial, Widner testified that after seeing and listening to the tape, Pettus stated, "I guess I didn't get the whole story," and "I guess I have been

3

lied to." The internal affairs investigation into Viehmann's conduct was closed. The tape used by Viehmann was put back into rotation to be re-used.

In 2004, Viehmann discussed the events with Texas Ranger Aaron Dwayne Williams while the two were having lunch. Williams then began an investigation into the incident. He presented his findings to the Young County grand jury. The grand jury heard testimony from Richard Ferguson, a Graham police officer, that he had heard the radio conversations between Dodson and Viehmann, and that a couple of days later, he saw Dodson and Appellant at dispatch with a tape recorder hooked up to the 911 system, taping an edited copy of what was playing on the system. Ferguson recognized what he heard as the events of November 23. Ferguson gave this same testimony at trial.

The tape used by Viehmann was turned over to Williams, but by then it had already been taped over. In February 2003, the 911 system had been replaced, and the old system had been put into a storage room. In April 2004, Jan Hammond, the IT administrator for Young County, was asked to locate the old system and the tapes that had been used with it. She found the machine in Chief Deputy Gary Barnett's office on the floor. The top had been taken off of the machine, and it looked to Hammond as though it had been pried off.

Hammond found the tapes on a shelf in the storage room. That machine recorded on two tapes simultaneously—an "A" tape and a "B" tape. The "A"

4

tape from November 2002 had "bad" written on it and had been erased. The "B" tape was turned over to Williams.

Dodson testified to the grand jury that on the night of the confrontation with Viehmann, she called Appellant, another employee of the Young County Sheriff's office, because she was upset, and Appellant came to the station. Dodson further testified that she did not remember anyone asking for a copy of a tape, if anyone had asked her to make a tape, she would have asked someone else to do it because she did not know how to make a copy, she did not make a copy of a tape and did not remember assisting anyone to do so, and she did not know who made the tape. She also stated that she did not erase the original 911 tape and did not know who did. Her grand jury testimony was read to the jury at trial.

Appellant testified to the grand jury that on November 23, 2002, she was assigned to the patrol division but was not working that day. After receiving a call from Dodson that night, she ran dispatch for Dodson, who was upset. Appellant testified that she did not make the recording, did not assist in making the recording, and was not present when it was made. She testified that she would not call Ferguson a liar, that "[i]f he said he saw [her] making [the tape], then evidently [she] was," but she did not remember making the tape. She also

5

stated that she did not erase the original 911 tape.  Her grand jury testimony was read to the jury at trial.

At trial, four people who had worked with Ferguson, including Ferguson's supervisor, testified that Ferguson's reputation in the community for truth and veracity was bad.

## LEGAL SUFFICIENCY OF THE EVIDENCE UNDER ARTICLE 38.18

Appellant argues in her second issue that the evidence is legally insufficient under article 38.18 of the code of criminal procedure to support the verdict.  Article 38.18(a) provides that "[n]o person may be convicted of perjury or aggravated perjury if proof that [her] statement is false rests solely upon the testimony of one witness other than the defendant."[1]  Appellant argues that article 38.18 is controlled by article 38.17, which provides, "In all cases where, by law, two witnesses, or one with corroborating circumstances, are required to authorize a conviction, if the requirement be not fulfilled, the court shall instruct the jury to render a verdict of acquittal, and they are bound by the instruction."[2]  The State argues that article 38.18 is merely "a statutorily imposed sufficiency review and is not derived from federal or state

---

[1] TEX. CODE CRIM. PROC. ANN. art. 38.18(a) (Vernon 2005).

[2] See *id.* art. 38.17.

6

constitutional principles that define the legal and factual sufficiency standards," much like the accomplice witness rule.[3] The State is only partially correct. The accomplice witness rule specifically states that in addition to an accomplice witness's testimony, there must be evidence tending to connect the defendant to the offense.[4] The accomplice witness rule is not a true sufficiency test; it merely instructs in the determination of sufficiency. That is, the accomplice witness's testimony must be disregarded in determining whether there is other evidence tending to connect the defendant to the offense.[5] The additional evidence does not have to be legally or factually sufficient to sustain the conviction.[6] It need only tend to connect the defendant to the offense.[7]

Article 38.18 is slightly different. It instructs that there must be more than a single witness's testimony. To sustain a conviction for perjury or aggravated perjury, the State must produce more evidence than the testimony

---

[3] *Cathey v. State*, 992 S.W.2d 460, 462–63 (Tex. Crim. App. 1999), *cert. denied*, 528 U.S. 1082 (2000).

[4] TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005).

[5] *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001).

[6] *Id.*

[7] *Id.*

of the defendant and another witness.[8]   But there is no corroboration requirement.[9]

The State produced the testimony of Richard Ferguson.  In addition, as the State points out, it offered Appellant's grand jury testimony, and that of Dodson, "including their vacillating and implausible testimony and sudden loss of memory after being confronted with the fact that Ferguson claimed to have seen them making the record, which the grand jurors themselves apparently found to be incredible."  The State also points to testimony from multiple witnesses that Dodson and Appellant were together in the dispatch office that Saturday night after Widner had requested a copy of the 911 tape, as well as evidence from the B tape that Widner had made the request and that Dodson had told the sheriff about it.

Additionally, the State relies on testimony that both Appellant and Dodson attempted to shift the blame to another dispatcher and testimony regarding the B tape and its contents that proved that Dodson had testified untruthfully about other aspects of the night's events.  The State also directs

---

[8] TEX. CODE CRIM. PROC. ANN. art. 38.18.

[9] *See id.; see also Martin v. State*, 13 S.W.3d 133, 140 (Tex. App.—Dallas 2000, no pet.); *Tamayo v. State*, 924 S.W.2d 213, 216 n.1 (Tex. App.—Beaumont 1996, no pet.).

8

us to testimony from Ranger Williams and from the defense expert that corroborated the background voices on the tape, one of which Williams testified he recognized as Ferguson's. The State also points to testimony from multiple witnesses that Dodson was essentially the instigator of the initial dispute and had motive to alter the tape to make herself look better and shift blame to Viehmann, Appellant was Dodson's good friend, the two of them had the opportunity to make the cassette tape that Saturday night, and the tape appeared in the sheriff's office on Monday morning.

The State argues that the jury was able to consider the entirety of the evidence and compare Appellant's and Dodson's testimony and their similar losses of memory, their demeanor, and their grand jury testimony. We hold that the evidence recited above is sufficient to satisfy article 38.18. We therefore overrule Appellant's second issue.

### SUFFICIENCY OF THE EVIDENCE OF INTENT TO DECEIVE

In her third issue, Appellant contends that the evidence is legally insufficient to support the verdict. In her fourth issue, she contends that the evidence is factually insufficient to support the verdict. Specifically, Appellant contends that the evidence is legally and factually insufficient to show that she had the intent to deceive. Section 37.03 of the penal code provides,

(a) A person commits an offense, [aggravated perjury], if he

9

commits perjury as defined in Section 37.02, and the false statement:

(1) is made during or in connection with an official proceeding; and

(2) is material.[10]

Section 37.02 provides,

(a) A person commits an offense if, with intent to deceive and with knowledge of the statement's meaning:

(1) he makes a false statement under oath or swears to the truth of a false statement previously made and the statement is required or authorized by law to be made under oath.[11]

Dodson testified that she did not make the tape, she did not know how to use the equipment, she knew nothing about the original 911 tape being erased, she had told the sheriff that she did not remember making a copy of the 911 tape, and if she had anything to do with making a copy of the tape, she did not remember it. She also testified that she could not dispute Ferguson's testimony that he saw her with Appellant making the tape because she did not remember it. Dodson denied telling the sheriff that Widner had asked for a copy of the 911 tape, but she admitted that if the tape showed that she had done so, then it did in fact happen. When asked if she had ever listened to the

---

[10] TEX. PENAL CODE ANN. § 37.03 (Vernon 2003).

[11] Id. § 37.02.

real 911 tape after the night in question, or on that night, Dodson responded, "Not that I know of." When the prosecutor admonished her that false testimony could lead to an aggravated perjury charge and explained to her the defense of retraction, she stated, "I do not remember making that tape with [Appellant]. I did not make the tape by myself. I called the sheriff to tell him that I threw a fit."

Appellant testified that, "[I]f you have my name and initials on that tape then I probably did [assist in making the tape]. I don't remember making it is what I'm telling you." She also explained that she did not think that any of that was important at the time. Finally, when a grand juror asked her if she had heard Dodson telling Sheriff Pettus that night that Widner had requested a copy of the tape, Appellant stated, "She did? Okay. Then maybe she made it that night."

Marsha Sumpter, the 911 coordinator for Young County, testified that Dodson was the person who had a fight with Viehmann and that both she and Appellant knew how to operate the logger machine. Sumpter listened to the November 25, 2002, transmissions and heard Widner call in and ask for taped copies again. She also heard Teresa McGehee call back about ten minutes later and tell Widner that the tape had been made. Sumpter testified that you should not be able to copy a tape of twenty-eight minutes of activity in ten minutes.

11

The defense expert forensic tape examiner, Al Yonovitz, opined that he did not believe that the tape had been maliciously changed. He did agree, however, that State's exhibit 1A, the cassette tape, did not reflect everything in the 911 transmissions for November 23, 2002, from 5:30-6:00 p.m. and again from 6:27-6:30 p.m.

As the State points out, in a prosecution for aggravated perjury, intent to deceive may be inferred from the circumstances.[12] The State argues that the jury could consider Appellant's grand jury testimony in light of all the other evidence including their knowledge of her background as an officer and the likelihood that she had testified before. They were free to take into account the fact that she did not experience memory problems until Ferguson was discussed as an eyewitness. They were also free to consider as suspicious her repeated assertions that her name would be written on the tape had she recorded it and her reaction of "sudden and selective memory loss" to the news that Ferguson had implicated her, which was strangely similar to Dodson's sudden and selective memory loss.

Applying the proper standards of review,[13] we hold the evidence legally

---

[12] *Bodmer v. State*, 161 S.W.3d 9, 12 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

[13] *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789

and factually sufficient to prove Appellant's intent to deceive. We overrule

Appellant's third and fourth issues.

<strong>DEFENSE OF RETRACTION</strong>

In her fifth and sixth issues, Appellant argues that the evidence is legally

and factually insufficient to disprove the defense of retraction. Section 37.05

of the penal code provides,

> It is a defense to prosecution under Section 37.03 (Aggravated Perjury) that the actor retracted his false statement:
>
> (1) before completion of the testimony at the official proceeding; and
>
> (2) before it became manifest that the falsity of the statement would be exposed.[14]

When interpreting a statute, we look to the literal text for its meaning, and we

ordinarily give effect to that plain meaning.[15] The only exceptions to this rule

are where application of the statute's plain language would lead to absurd

consequences that the Texas Legislature could not possibly have intended, or

---

(1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (both providing legal sufficiency standard of review); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005); *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003); *Johnson*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000) (all providing factual sufficiency standard of review).

[14] TEX. PENAL CODE ANN. § 37.05 (Vernon 2003).

[15] *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

if the plain language is ambiguous.[16]

The plain language of this statute required Appellant to retract the statement before the completion of her testimony and before it became manifest that the falsity of the statement would be exposed.[17] *Retract* means to draw back, take back, withdraw, disavow, or recant.[18] We have carefully examined the record and find no place in which Appellant retracted the testimony at issue; a lack of recollection is not a retraction. Applying the proper standards of review for legal[19] and factual[20] sufficiency of the evidence disproving the defense, we hold that the evidence is legally and factually sufficient to disprove the defense of retraction. We overrule Appellant's fifth and sixth issues.

## ADMISSIBILITY OF HEARSAY

In her first issue, Appellant argues that the trial court erred in admitting over objection a hearsay statement of Sheriff Pettus, who did not testify at

[16] *Id.*

[17] TEX. PENAL CODE ANN. § 37.05.

[18] MERRIAM-WEBSTER ONLINE DICTIONARY 2008, http://www.merriam-webster.com/dictionary/retract (last visited August 21, 2008).

[19] *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991).

[20] *See Watson*, 204 S.W.3d at 414; *Zuliani*, 97 S.W.3d at 595.

14

trial. We have carefully examined the record. Assistant Chief Widner and Jim Nance were allowed to testify over Appellant's hearsay objection that, at the meeting they had with Sheriff Pettus, after listening to the cassette tape, Pettus stated, "I guess I've been lied to." As Appellant argues, the statement is clearly hearsay. The State conceded at trial that the statement was hearsay by offering it as an exception to the prohibition against hearsay evidence. The State offered the statement as a present sense impression, evidence of then existing mental or emotional state, and an excited utterance.[21]

The statement satisfies none of those exceptions. The State argues that Appellant failed to preserve this complaint. Appellant did not object after the first time the statement was offered. Instead, she objected earlier, in the middle of the statement. The witness testified that the sheriff said, "I guess I didn't get the whole story. I guess—." Appellant objected on hearsay grounds, her objection was overruled, and she requested a limiting instruction. Afterward, the rest of the statement came in without additional objection. Under the facts of this case, we hold that the objection made mid-sentence also applied to the rest of the statement that was admitted after the objection.

Appellant also timely objected the second time the statement was made.

---

[21] *See* TEX. R. EVID. 803(1), (2), (3).

15

But Appellant did not object to the third mention of the statement. Because Appellant did not object to the third admission of the statement, she has not preserved error.[22] We overrule Appellant's first issue.

## CHARGE ERROR

In her seventh issue, Appellant contends that the trial court improperly instructed the jury that the statement in question, if any, made by Appellant, if it was made, would be material. Appellant argues that because materiality is an element of the offense,[23] an instruction that the statement in question was material instructed the jury on an element to be determined by the jury and that the instruction therefore violated Appellant's right to due process under the Constitution of the United States. We note that section 37.04(c) of the penal code provides that materiality is a question of law.[24] But, as Appellant points out, the United States Supreme Court has held that whether a statement is material must be submitted to the jury.[25]

---

[22] *See Fuentes v. State*, 991 S.W.2d 267, 273 (Tex. Crim. App.), *cert. denied,* 528 U.S. 1026 (1999); *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *Ethington v. State*, 819 S.W.2d 854, 858–59 (Tex. Crim. App. 1991).

[23] *See* TEX. PENAL CODE ANN. § 37.04 (Vernon 2003).

[24] *Id.* § 37.04(c).

[25] *United States v. Gaudin*, 515 U.S. 506, 522–23, 115 S. Ct. 2310, 2320 (1995) (holding refusal to submit issue of materiality to jury

16

The case before this court is distinguishable in part from *Gaudin* because Appellant's jury was instructed in the application paragraph that it must determine the materiality of the statement. But the jury was also instructed that the statement under consideration was, in fact, material and that the only issue was whether Appellant had made the statement. We therefore hold that the charge was erroneous.

Appellant timely objected to this error, so we must determine whether Appellant suffered any harm from the improper instruction.[26] A properly preserved error will require reversal as long as the error is not harmless.[27] In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole."[28]

Appellant argues that reversal is mandated by the Fifth Circuit decision

---

unconstitutional); *see also Ward v. State*, 938 S.W.2d 525, 530 (Tex. App.—Texarkana 1997, pet. ref'd) (noting that section 37.04(c) is most likely not good law after *Gaudin*).

[26] *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g).

[27] *Id.*

[28] *Id.*; *see also Ovalle v. State*, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).

in *U.S. v. Pettigrew*.[29]  *Pettigrew* addressed the complete withholding of the issue of materiality from the jury, resulting in the jury's rendering no verdict as to that element of the offense.[30]  In the case now before this court, however, the jury did render a verdict as to the materiality element.  But the jury was instructed to render that verdict if they found Appellant had made the statement in question.

The State argues that materiality was never an issue in the case.  Materiality was unchallenged and uncontested.  Based on our review of the record, we agree.  Because materiality was never an issue in this case, we hold, under the limited and unique facts of this case, that Appellant suffered no harm from the erroneous instruction.  Accordingly, we overrule Appellant's seventh issue.

### CONCLUSION

Having overruled Appellant's seven issues, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  CAYCE, C.J.; DAUPHINOT and MCCOY, JJ.

CAYCE, C.J. concurs without opinion.

---

[29] 77 F.3d 1500 (5th Cir. 1996).

[30] *Id.* at 1511.

18

PUBLISH

DELIVERED: August 21, 2008