

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00070-CR

———————————————

JON PRESTON ROMER, JR., Appellant

V.

THE STATE OF TEXAS

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1537351R

Before Kerr, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Jon Preston Romer, Jr. appeals from his conviction and five-year sentence for aggravated perjury, based on a statement he made under oath during a grand-jury proceeding. *See* Tex. Penal Code Ann. § 37.03. Romer raises six complaints about his conviction: (1) the evidence was insufficient to convict him because he contends that Texas Code of Criminal Procedure Article 38.18 requires two witnesses to testify that he made a false statement, and the State produced only one; (2) the evidence was insufficient to prove that his alleged false statement was material; (3) Article 38.22, Section 4 of the Code of Criminal Procedure—which the State relied on to deny Romer probation—is constitutionally void for violating the single-subject rule; (4) Code of Criminal Procedure Articles 42A.053 and 42A.054, which do not categorically exclude aggravated-perjury convictions from judge-imposed probation eligibility, govern over Article 38.22, Section 4 so that the latter could not apply to this case; (5) even if not conflicting with Articles 42A.053 and 42A.054, Section 4 of Article 38.22 does not apply to these facts, and the jury's special-issue finding under that provision has no factual support; and (6) the Article 38.22, Section 4 special-issue instruction's language was contrary to the statute and confusing to the jury. Tex. Code Crim. Proc. Ann. arts. 38.18, 38.22, § 4, 42A.053(a), (c), 42A.054; Tex. Penal Code Ann. § 37.03.

Because we hold that the trial court reversibly erred by including the Article 38.22, Section 4 instruction in the charge, we reverse Romer's conviction and sentence and remand this case for a new trial.

## II. BACKGROUND

The events giving rise to this case started on November 5, 2016, with an encounter between private security officer Jeremy Flores and recently discharged patient Henry Newson, Jr. in the lobby of Texas Health Harris Methodist Hospital (Harris) in Fort Worth, that escalated to include off-duty Fort Worth police officer Romer.[1]  At the time, Romer was employed by Harris but in his capacity as a peace officer.

Flores first encountered Newson while Newson was talking on a cell phone that he had borrowed from a man who was sitting in the Harris lobby using a laptop. Flores approached Newson and stood next to him as Newson talked on the phone; at one point, Newson handed Flores the cell phone, and Flores began talking on it. After several minutes, Flores eventually called a "290," which is a call to dispatch for

---

[1]Although the State spent some time at trial eliciting evidence concerning whether Romer's actions during the encounter were justified, the main dispute at trial was whether Romer committed aggravated perjury when he later testified before a grand jury investigating his actions that he told Newson he was under arrest before using a distractionary striking technique to help subdue him.

3

off-duty security provided by licensed peace officers. Romer responded. Although Flores was wearing a bodycam, Romer was not.[2]

After Romer arrived and began standing next to Flores and Newson, Newson refused to answer Flores's questions and complained about being asked those questions. Eventually, Romer told Newson, "Let's go," and started pushing Newson away from the scene. When Newson appeared to resist Romer's moving him, Romer struck Newson while trying to pull him to the ground.[3]

Flores began to help Romer subdue Newson. Another Harris security officer, Jonathan Walterbach, arrived, as well as Flores's supervisor, Jeff Crieger. After the group subdued Newson and handcuffed him, Romer told Newson that he was under arrest.[4] Flores and Romer then walked away from Newson so that Flores could tell Crieger what happened. While Flores was talking, Romer added, "You asked him to leave." Flores then told Crieger, "Romer said, 'Get off [the] property.'"

As a result of the incident, the Fort Worth Police Department filed complaints against Newson for misdemeanor resisting arrest and misdemeanor criminal trespass, and the Tarrant County District Attorney filed an information for each offense.

---

[2]Video of the incident was also recorded via a remotely monitored security camera.

[3]Throughout the record, this action is described as a distractionary technique. But the parties disputed whether Romer was justified in using the technique during this particular encounter.

[4]It is undisputed that Romer told Newson at this time that he was under arrest.

4

When reviewing the case file for the charges against Newson, the District Attorney's office became concerned about whether Romer's striking Newson was justified.[5] Lloyd Whelchel, the then Chief of the Misdemeanor Section of that office, instructed the assigned attorney and another assistant district attorney to interview Romer.

During that interview, at which Romer was accompanied by his supervising officer, the assigned assistant district attorney got the impression from both officers "that the Fort Worth Police Department chain of command had approved the use of force" against Newson. She also said Romer told her at the meeting that "hospital security staff had already asked Newson to leave multiple times."

After the District Attorney's investigation into Newson's pending charges and the meeting with Romer, Whelchel moved to dismiss both of Newson's pending cases. The trial court dismissed them on March 10, 2017.

Eight months later, in November 2017, Newson sued Harris and Romer for using excessive force against him. In December 2017, the Fort Worth Police Department began investigating Romer's actions during the encounter with Newson. On February 23, 2018, a grand jury convened[6] to investigate whether Romer should

---

[5]According to the assistant district attorney assigned to Newson's cases, Romer was "very upset" and "yelled" at her when she called to explain that she was not comfortable moving forward with either of the cases and that the District Attorney's office "did not agree with the distraction technique that was used."

[6]Because the Tarrant County Criminal District Attorney filed a request to recuse herself and her office from participation in the case, which the trial court

5

be charged with official oppression, making false statements during his meeting with the assistant district attorneys, or both. During those proceedings, in response to grand jurors' questions about what they could and could not hear on Flores's bodycam recording of the encounter, Romer testified repeatedly and unequivocally that before striking Newson, he had told him that he was under arrest. Romer was later indicted for aggravated perjury[7] based on that grand-jury testimony.

At Romer's aggravated-perjury trial, excerpts from Romer's February 23, 2018 grand-jury testimony were admitted. In addition, seven video recordings from Harris were admitted collectively (in seven parts) as State's Exhibit 1: two videos from Flores's bodycam (referred to in the reporter's record as Flores 1 and Flores 2);[8] two videos from Crieger's bodycam; one video from responding security officer Walterbach's bodycam; one video from the remote security camera that recorded the entire incident (referred to in the reporter's record as the Richardson Tower Mall camera); and one video from a different remote camera in the lobby that did not show

---

granted, the trial court appointed an attorney pro tem for "the investigation, prosecution, appeals, and post-trial matters, if any."

[7]Romer was also indicted for official oppression and for making a false report to a police officer or law-enforcement employee. Although the record shows that the official oppression case was tried separately, it does not show the result of that trial, nor does it show the disposition of the false-report indictment.

[8]The Flores 1 recording includes Romer's arrival while Flores was talking to Newson and what happened between Romer and Newson, and it ends after Newson was walked outside the hospital and Romer was talking to him. Flores 2 begins outside the hospital and records Romer and the security officers talking with Newson.

6

the disputed events (referred to in the reporter's record as the Richardson Tower Ground East camera).[9]

But the trial court also admitted a different video, State's Exhibit 10, which combined the Flores 1 and Richardson Tower Mall recordings so that they were side-by-side on one screen and played simultaneously.[10] This recording was prepared by an audio forensic consultant, who had enhanced Flores 1 to, among other things, reduce background noise and enhance the audio of the speaking voices. The consultant who forensically analyzed the bodycam recordings testified that he never heard Romer on Flores 1 telling Newson, before striking him, that he was under arrest.

Additionally, Newson testified that Romer did not tell him he was under arrest before striking him. Flores could not recall[11] whether Romer told Newson before striking him that Newson was under arrest.[12]

---

[9]The bodycam recordings include audio, but the remote-camera recordings do not.

[10]Part of Crieger's bodycam recording was also added to State's Exhibit 10, but it begins after he responded to the incident; therefore, it does not include the disputed part of the encounter—what Romer did or did not say before using the distractionary strike. We have viewed all of the videos admitted at trial.

[11]Flores answered somewhat equivocally, "Not that I can recall," when asked, "At no time prior to Officer Romer striking Henry Newson in the face did you hear him tell Mr. Newson he was under arrest prior to the punch?"

[12]Other witnesses testified that after viewing and listening to Flores 1, they could not hear Romer telling Newson he was under arrest before striking him.

At the charge conference on guilt–innocence, Romer objected to the trial court's submitting to the jury a special issue under Article 38.22, Section 4. Romer argued that the section is not applicable to these facts—and thus not law applicable to the case—because it "is contrary to what this particular article is setting out and its purpose for, and it's not relevant to the factual circumstances . . . and specifically the indictment as it is set forth by the State."

The trial judge denied Romer's objection and included the following special-issue question in the charge:

> Nothing in Texas Code of Criminal Procedure 38.22 precludes the admission of a statement made by an accused in open court, before a grand jury, or at an examining trial, or of a statement that is the res gestae of the arrest or of the offense, or of a statement that does not stem from custodial interrogation, or of a voluntary statement, whether or not the result of custodial interrogation, that has a bearing upon the credibility of the accused as a witness, or of any other statement that may be admissible under law.
>
> Our law further provides that when any statement, the admissibility of which is covered by Texas Code of Criminal Procedure 38.22, [is] sought to be used in connection with an official proceeding, any person who swears falsely to facts and circumstances which, if true, would render the statement admissible under Texas Code of Criminal Procedure 38.22 is presumed to have acted with intent to deceive and with knowledge of the statement's meaning for the purpose of prosecution for aggravated perjury.
>
> Now therefore if you find beyond a reasonable doubt that the statement or statements by Jon Preston Romer Jr. on or about February 23, 2018, would have been sought to have been used in an official proceeding and you further find that Jon Preston Romer Jr. swore falsely to facts and circumstances which if true would have rendered the statements by Henry Newson admissible you will presume the

8

defendant, Jon Preston Romer Jr., acted with intent to deceive and with knowledge of the statement's meaning.

## VERDICT FORM SPECIAL ISSUE

Do you find beyond a reasonable doubt that the statement or statements by Jon Preston Romer Jr. on or about February 23, 2018, would have been sought to have been used in an official proceeding and do you further find beyond a reasonable doubt that Jon Preston Romer Jr. swore falsely to facts and circumstances which if true would have rendered the statements by Henry Newson admissible?

The jury subsequently convicted Romer of aggravated perjury and answered the special issue affirmatively, thus rendering Romer ineligible for probation. Romer elected to have the trial judge assess punishment, and the judge did so, ultimately sentencing Romer to five years' confinement. Romer filed this appeal.

### III. DISCUSSION

Romer's first issue challenges the sufficiency of the evidence to prove that he made a false statement, based on his interpretation of Article 38.18 of the Code of Criminal Procedure. His second issue challenges the sufficiency of the evidence to prove one of the aggravating elements: whether his alleged false statement was material. Romer's third through sixth issues challenge whether the trial court erred by submitting the Article 38.22, Section 4 instruction to the jury. We address only his first issue and his dispositive fifth issue[13]—that "[t]he finding by the jury under the

---

[13]Although we normally would be required to address Romer's sufficiency challenge to the materiality element despite our disposition of Romer's fifth issue, we need not here because deciding it in Romer's favor would not result in an outright acquittal. *See Thornton v. State*, 425 S.W.3d 289, 300 (Tex. Crim. App. 2014) (explaining

special issue was unsupported by the facts, and [A]rticle 38.22[, S]ection 4 should not have been applied to [him] in any event."[14]  *See* Tex. R. App. P. 47.1.

## A.  Elements of Aggravated Perjury

A person commits perjury under Texas law if he makes a false statement under oath with the intent to deceive and with knowledge of the statement's meaning.  Tex. Penal Code Ann. § 37.02(a).  Perjury is aggravated if the false statement was material and "made during or in connection with an official proceeding."  *Id.* § 37.03(a).  Section 37.03 applies to grand-jury proceedings.  *See generally Teague v. State*, 268 S.W.3d 664 (Tex. App.—Fort Worth 2008, pet. ref'd).

## B.  Article 38.18 Satisfied

Romer contends in his first issue that Code of Criminal Procedure Article 38.18(a), which provides that "[n]o person may be convicted of perjury or aggravated perjury if proof that his statement is false rests solely upon the testimony of one

---

when court of appeals should acquit outright or reform judgment to available lesser-included offense).  However, we have reviewed the entire record for purposes of addressing harm relevant to Romer's fifth issue.

[14]Because we hold that the Article 38.22, Section 4 special issue should not have been submitted to the jury in the first place, we need not address Romer's issues related to the constitutional and statutory validity of that section in general or to the exact wording of the special issue in the jury charge, regardless of whether those issues were adequately preserved.  *See Love v. State*, 600 S.W.3d 460, 485 (Tex. App.—Fort Worth 2020, pet. ref'd) (declining to address issues that could not afford appellant greater relief if also sustained); *cf. Ex parte Fairchild-Porche*, 638 S.W.3d 770, 780 (Tex. App.—Houston [14th Dist.] 2021, no pet.) ("Judicial restraint counsels courts against anticipating a constitutional issue before it is necessary to decide the issue . . . .").

witness other than the defendant," requires two witnesses to testify that the defendant's statement was false; therefore, because only one contemporaneous witness to the encounter—Newson—testified affirmatively that Romer never told him before striking him that he was under arrest, the State did not produce sufficient evidence under Article 38.18. Tex. Code Crim. Proc. Ann. art. 38.18. Although Romer acknowledges that the State offered evidence through Flores 1,[15] he argues that such evidence "could hardly count as a 'witness' under [A]rticle 38.18."

Contrary to Romer's argument, Article 38.18 does not require two witnesses to testify that a defendant's statement was false. Instead, that section "instructs that there must be more than a single witness's testimony"; in other words, "the State must produce more *evidence* than the testimony of the defendant and another witness."[16] *Teague*, 268 S.W.3d at 669 (emphasis added); *see also Dodson v. State*, 268 S.W.3d 674, 677 (Tex. App.—Fort Worth 2008, pet. ref'd); *Chandler v. State*, 756 S.W.2d 828, 829 (Tex. App.—Corpus Christi–Edinburg 1988, pet. ref'd); *Springer v. State*, 721 S.W.2d 510, 512 (Tex. App.—Houston [14th Dist.] 1986, pet. ref'd).

Here, the jury had additional evidence that it could consider other than Newson's testimony: (1) Flores 1 itself, as well as the testimony of witnesses who had

---

[15]For purposes of our analysis, we reference Flores 1 as part of both State's Exhibit 1 and State's Exhibit 10.

[16]This situation—in which the only evidence of falsity was the testimony of one witness—was the case in *Goswick v. State*, 559 S.W.3d 258, 259, 261 (Tex. App.—Eastland 2018, pet. ref'd), upon which Romer relies. Therefore, *Goswick* is inapposite.

11

viewed and listened to it; and (2) the grand-jury transcript, in which the grand jurors themselves indicated they could not hear Romer making such a statement. This evidence, which we have viewed as well, goes beyond the testimony of one person in direct opposition to the defendant's denial of guilt. Romer does not argue or provide any authority that recordings are inherently less probative than witness testimony. Accordingly, we hold that the State met its evidentiary burden under Article 38.18. We overrule Romer's first issue.

## C. Article 38.22, Section 4 Instruction Improper

### 1. Standard of Review

Article 36.14 of the Code of Criminal Procedure requires the trial court to instruct the jury on the law applicable to the case. Tex. Code Crim. Proc. Ann. art. 36.14. Thus, the trial judge is responsible for the accuracy of the charge and accompanying instructions. *Bell v. State*, 635 S.W.3d 641, 645 (Tex. Crim. App. 2021). When the trial court fails to set forth the correct law applicable to the case, jury-charge error results. *Id.*

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Id.* But whether a charge-error complaint was preserved at trial is important to the harm standard we use after finding error: Error in the charge, if timely objected to in the trial court, requires reversal if the error "was calculated to injure the rights of

12

[the] defendant," which means no more than that there must be *some* harm to the accused from the error. Tex. Code Crim. Proc. Ann. art. 36.19; *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). In other words, a properly preserved error, unless harmless, requires reversal. *Almanza*, 686 S.W.2d at 171.

### 2. Article 38.22, Section 4's Plain Language and Inapplicability

Romer and the State disagree on the meaning and applicability of Article 38.22, Section 4. We review statutory-construction issues de novo, as a matter of law. *Cary v. State*, 507 S.W.3d 750, 756 (Tex. Crim. App. 2016). When interpreting a statute, we look to the literal text of the statute for its meaning and give effect to that plain meaning unless application of the statute's plain language would lead to absurd consequences that the Legislature could not possibly have intended or unless the plain language is ambiguous. *Parker v. State*, No. PD-0388-21, 2022 WL 2963533, at *3 (Tex. Crim. App. July 27, 2022).

Article 38.22, Section 4 is specific to aggravated-perjury prosecutions and provides as follows:

> When any statement, the admissibility of which is covered by this article, is sought to be used in connection with an official proceeding, any person who swears falsely to facts and circumstances which, if true, would render the statement admissible under this article is presumed to have acted with intent to deceive and with knowledge of the statement's meaning for the purpose of prosecution for aggravated perjury under

13

Section 37.03 of the Penal Code. No person prosecuted under this subsection shall be eligible for probation.

Tex. Code Crim. Proc. Ann. art. 38.22, § 4.

For Article 38.22, Section 4 to apply, the admissibility of the "statement" at issue must be "covered by" Article 38.22. *Id.* Article 38.22's preconditions to a written or oral statement's admissibility (what Article 38.22 covers) apply only to statements resulting from custodial interrogation. *Id.*, §§ 1–3, 5;[17] *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996); *State v. Howard*, 378 S.W.3d 535, 541 (Tex. App.—Fort Worth 2012, pet. ref'd); *cf. Chambliss v. State*, 647 S.W.2d 257, 258– 62 (Tex. Crim. App. 1983) (holding that in the 1977 amendments to Article 38.22, the Texas Legislature changed the focus of inadmissibility from statements made simply

---

[17]Section 3(a) provides that "[n]o oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless" (1) it is electronically recorded; (2) "prior to the statement but during the recording[,] the accused is given the" statutory warnings set forth in 2(a) applicable to written statements and "knowingly, intelligently, and voluntarily waives" those rights; (3) "the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered"; (4) every voice that can be heard is identified; and (5) "not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant." Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a). Although an officer's telling a suspect he is not free to leave can show custody for the purpose of making the Article 38.22 prerequisites to a statement's admissibility applicable, it is not the only situation constituting such custody. *See Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009) (listing also when the suspect is physically deprived of his freedom of action in any significant way, when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and when law enforcement officers who have probable cause to arrest do not tell the suspect he is free to leave).

14

while in custody to statements made in response to custodial interrogation). Moreover, the statement "covered by" Article 38.22, under Section 4's plain language, is the statement that is sought to be rendered admissible in an official proceeding by virtue of false testimony about the facts and circumstances of the making of that statement. Tex. Code Crim. Proc. Ann. art. 38.22, § 4. Accordingly, for Section 4 to apply here, Romer's grand-jury testimony must have been for the purpose of rendering a statement *made by Newson* "as a result of custodial interrogation" admissible under Article 38.22. *See Davidson v. State*, 25 S.W.3d 183, 186 (Tex. Crim. App. 2000) ("Art. 38.22 . . . deals with an evidentiary matter: when oral statements *by an accused*, made as [a] result of custodial interrogation, are admissible against the accused in a criminal proceeding." (emphasis added)).

Therefore, under the plain language of Section 4 itself, the "statement" covered by Article 38.22 cannot be Romer's grand-jury testimony; Romer's statement—that he told Newson before striking him that he was under arrest—does not go to any of the preconditions to an oral statement's admissibility under Article 38.22, Section 3(a).[18] *See* Tex. Code Crim. Proc. Ann. art. 38.22, §§ 3–4; *cf. id.*, § 5 ("Nothing in this article

---

[18]The State's theory at trial—as expressed to the jury—was that Article 38.22, Section 4 applies whenever a police officer lies about an arrest, not specifically about facts and circumstances that would show Article 38.22's preconditions to admissibility were met. To the contrary, from the record as a whole, Romer's grand-jury statement appears to have had more to do with showing—for purposes of Fort Worth Police Department procedure and Newson's civil suit—that he thought his striking Newson was justified under the circumstances.

precludes the admission of a statement made by the accused . . . before a grand jury . . . ."); *Fuller v. State*, 827 S.W.2d 919, 927–28 (Tex. Crim. App. 1992) (holding that an accused's voluntary sworn confession before a grand jury is admissible without having to meet any of Article 38.22's prerequisites); *Cerda v. State*, 10 S.W.3d 748, 752–54 (Tex. App.—Corpus Christi–Edinburg 2000, no pet.) (holding that Article 38.22, Section 6 requiring voluntariness findings did not apply to statement made under oath during grand-jury proceedings). Thus, the trial court's special-issue instruction incorrectly asked the jury whether "the statement or statements by Jon Preston Romer Jr. on or about February 23, 2018, would have been sought to have been used in an official proceeding"; under the plain language of Section 4, Romer's alleged false statement in the grand-jury proceeding could have applied only to facts and circumstances that would have made Newson's otherwise inadmissible post-arrest statements admissible under Article 38.22.

The State neither alleged nor proved that Romer swore falsely to facts and circumstances surrounding any statement made by Newson[19] for the purpose of rendering that statement admissible at a later proceeding under Article 38.22. Nothing in the record shows that the admissibility of any statements Newson made would have been affected by whether Romer had told Newson before striking him

---

[19]Throughout his interaction with both Flores and Romer, Newson made statements questioning their authority.

that he was under arrest.[20]  In other words, if Newson had been subject to any further prosecution for the events of November 5, 2016, any statements he made would have been admissible despite the operation of Article 38.22, not because of it, and therefore not because Romer's grand-jury statement—that he told Newson he was under arrest before striking him—made Newson's statements admissible.  Additionally, if the State relied on any statement made by Newson at the grand-jury proceeding, its admissibility, like that of Romer's statement, would not be "covered by" Article 38.22. *See* Tex. Code Crim. Proc. Ann. art. 38.22, §§ 4, 5.

We hold that, according to its plain language, Article 38.22, Section 4 does not apply to these facts and is therefore not "law applicable to the case."  Thus, the trial court erred by submitting this special issue to the jury.[21]  Because Romer preserved his objection to the inclusion of the special issue in the charge, we review the trial court's error for some harm.  *See Almanza*, 686 S.W.2d at 171.

---

[20]In fact, the State acknowledged in its brief that "Newson's statements on Flores 1 & 2 are both res gestae statements and statements that do not stem from custodial interrogation."  But the State went on to argue that Article 38.22, Section 4 applied to those statements for that very reason.  This argument misconstrues the plain-language meaning of "covered by this article" in Section 4.

[21]Because we hold that inclusion of the special issue in the charge was improper here based on the evidence at trial, we express no opinion on the general propriety of submitting such a question to the jury in the first place (i.e., whether such an issue is a question of fact or a question of law).

17

### 3. Inclusion of Special Issue Was Harmful

In determining whether the jury-charge error was "calculated to injure [Romer's] rights," we must consider and analyze (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record. *Reeves*, 420 S.W.3d at 816; *see also Almanza*, 686 S.W.2d at 171 ("[T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole.").

#### a. Voir Dire References

The discussion about the applicability of Article 38.22, Section 4 started at the beginning of the trial—in voir dire. During that time, Romer's counsel asked a prospective juror, "What is [Article 38.22] usually talking about?" The juror responded, "It's talking about interrogation and statements made . . . in different situations." When asked, "Like custodial interrogation?" he responded, "Right," and explained, "It's when law enforcement . . . is questioning you." Another prospective juror, when asked to give "an example of a custodial interrogation" from a "law show[]," answered, "They show that all the time when they are questioning someone after they have been arrested at the police station." Romer's counsel then turned specifically to Section 4 of Article 38.22:

18

All right. Everybody understand that? That's 38.22. So there is a section in 38.22 that says, "With any statement, the admissibility of which is covered by this article" -- meaning Article 38.22 -- "is sought to be used in connection with an official proceeding, any person who swears falsely to facts and circumstances which, if true, would render the statement admissible under this article is presumed to have acted with intent to deceive and with knowledge of the statement's meaning for the purpose of prosecution for aggravated perjury under the section."

So if you look right here, it says, "Acted with intent to deceive and with knowledge of the statement's meaning." And the reason why that's important is when we go back to the definition of aggravated perjury, there is these two elements with intent to deceive and with knowledge of the statement's meaning.

So did -- [prospective juror], to you, this enhancement where it's going to presume that you know that you've acted with an intent to deceive and with knowledge of the statement's meaning would fall under what scenario?

In response to Romer's counsel's question, the prospective juror responded, "That would be a lie."

The following colloquy ensued, interrupted by an objection from the State:

[Romer's counsel]: Okay. And for that lie to go under -- to affect a statement with the admissibility of which is covered under Article 38.22, what statement would that have to be?

[Prospective juror]: It would have to be a statement under oath -- a statement made -- made under oath to law enforcement personnel.

[Romer's counsel]: Okay. Somebody who's being prosecuted for aggravated perjury would have to make a false statement, right?

[Prospective juror]: That's correct.

[Romer's counsel]: That would have to affect the statement -- statement's admissibility of somebody else, right?

19

[Prospective juror]: I don't know about that. I'd see a false statement that's material to the matters under discussion.

[Romer's counsel]: Okay. But then, how do you think 38.22 would come into play?

[Prospective juror]: I'm not sure I gather your meaning.

[Romer's counsel]: Okay. This statute is confusing to me and that's why we are going through it. So you have a statement, right?

[Prospective juror]: Right.

[Romer's counsel]: And the admissibility of which is covered by this Article 38.22, so custodial interrogation, police interviewing a witness. And then you have someone who swears falsely to facts and circumstances which, if true, would render the statement admissible under this article is presumed to have acted with intent to deceive and with knowledge of the statement's meaning for the purposes of prosecution.

. . . .

[Prosecutor]: I have to object because that's actually not accurate. 38.22 has more parts to it than just custodial interrogation. For example, Section 5 has *res gestae* statements of an offense, so it's not exactly . . .

. . . .

[Romer's counsel]: Well, just for argument's sake, I just wanted to show how one statement is being used under 38.22. And so 38.22, from talking with [this prospective juror], we're just using custodial interrogation.

. . . .

[Romer's counsel]: My question is really, can you imagine a scenario where aggravated perjury would come into play with this enhancement would -- would be applicable?

[Prospective juror]: I mean, it would have to be -- it would have to be during the course of investigation, and it would have to be -- it's like a -- a statement within a statement is -- is really what the law is saying, you know, a statement was made for one purpose and then there was an investigation into it, and then the investigators, the law enforcement officials brought that statement in, and when you said this then, what do you say about it now, and that person is under oath while talking to law enforcement investigators about the previous statement that they made or actions they took or whatever it was and if they lie during the course of that investigation, then they've committed aggravated perjury because they were under oath while they were talking to the police about that earlier statement, and they are also subject to this enhancement that's in front of us right now because they made a mistake and -- maybe mistake or intentional -- lied that they did something wrong, then they were questioned about it under oath by law enforcement, and they didn't make it right, and they either lied, they made a mistake or falsified some situation with the law enforcement right then and there, and now they committed aggravated perjury against themselves from an earlier statement under the custodial interrogation that's happening right then.

[Romer's counsel]: Okay. So it's a very specific circumstances where this thing would apply?

[Prospective juror]: Yes.

### b. Trial References

The State only briefly referred to the special issue at the end of its opening statement: "We'll ask you to answer the special issue in the case[,] 'Yes,' because police officers can't lie about what happens."

Both the State and Romer offered expert testimony about whether Article 38.22, Section 4 applied to this case. On the second day of testimony, the State offered expert testimony from Jeff Stewart, Newson's former defense counsel for the dismissed misdemeanor charges. Romer's counsel asked for a voir dire examination

21

of Stewart, eventually objecting that he was not qualified to testify as an expert because his license to practice law was inactive[22] after his retirement. During the voir dire examination, one of the prosecutors described Stewart's opinion to the trial judge as follows: that Romer's "falsely testifying that . . . Newson was told he was under arrest prior to striking him would make . . . Newson's *res gestae* statements admissible in a resisting arrest prosecution against . . . Newson. And, therefore, in that situation, if that occurred, it would invoke or violate . . . 38.22, Section 4 . . . ." And while acknowledging that Newson's res gestae statements during the encounter would have been admissible against Newson in a subsequent prosecution against him, the State also argued to the trial judge that Section 4 is an enhancement to aggravated perjury because Romer testified falsely before the grand jury. The trial judge overruled Romer's qualification objection and allowed Stewart to testify.[23]

Stewart testified that if Romer had lied to the grand jury about telling Newson that he was under arrest for resisting arrest, before striking him, then Section 4 of

_____

[22]An eligible, licensed member of the State Bar of Texas may request to be enrolled as an inactive member. Tex. Gov't Code Ann. § 81.052(a)–(c).

[23]Although Romer objected to the State's expert on qualification grounds, neither Romer nor the State objected generally to the admission of expert testimony about the legal meaning and application of Article 38.22, Section 4—a question of law. We express no opinion on the merits as to the propriety of such testimony, but we note that an expert may not give an opinion on a "pure question of law." *Anderson v. State*, 193 S.W.3d 34, 38 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *see Rachal v. State*, 917 S.W.2d 799, 817 (Tex. Crim. App. 1996) ("Legal and policy questions are inappropriate before the factfinder."). We summarize the testimony as background and to give context to our harm discussion.

Article 38.22 was implicated, and Romer was presumed to have acted with the intent to deceive and with knowledge of the statement's falsity.[24] According to Stewart, had the charges against Newson not been dismissed, then at a subsequent trial, his res gestae statements[25] would have been admissible at that trial because, in the prosecutor's words, with which Stewart agreed, "Romer had said he had told the man he was under arrest before he struck him."

In contrast, Romer's expert testified that the falsity of Romer's statement about telling Newson he was under arrest, before striking him, had "no applicability or effect on the admissibility of the statement under Article 38.22." He explained that Article 38.22 sets forth the specific prerequisites that must be shown before an accused's oral or written statement made during custodial interrogation may be admissible at the accused's later trial.

In Romer's expert's opinion, Section 4's purpose "is to protect civilians from having police officers testify or falsely state facts that would render a statement

---

[24]Despite the dearth of reported opinions construing Article 38.22, Section 4, the prosecutor asked Stewart, "And you know that because you had practiced law for how many years?" and he answered, "Twenty-five."

[25]A statement is res gestae if it is made in response to a startling event, either spontaneously or impulsively, and without time for reflection or contrivance. *State v. Ortiz*, 346 S.W.3d 127, 137 (Tex. App.—Amarillo 2011), *aff'd*, 382 S.W.3d 367 (Tex. Crim. App. 2012). Statements may be admissible as res gestae of the arrest even when they are made as a result of custodial interrogation if the officer's inquiry is not leading or suggestive of an answer. *Etheridge v. State*, 903 S.W.2d 1, 15 (Tex. Crim. App. 1994).

23

admissible under th[at] article." He did not think Section 4 applies to res gestae statements and that even though Section 5 of Article 38.22 mentions res gestae statements, it is in the context of excluding such statements, which are otherwise admissible by law, from Article 38.22's prerequisites to admissibility. Although the prosecutor tried to get Romer's expert to admit that the words, "the admissibility of which is covered by this article," used in Section 4 could apply to res gestae statements, he would not agree. He summarized the Section's meaning as follows: "[I]f a police officer lies about a statement in order to get a custodial interrogation in evidence, then that's what Section 4 applies to."

During closing argument, the State argued that the only issue the jury needed to focus on was whether Romer had lied to the grand jury but then also argued that Romer had been lying from the very beginning of the incident with Newson and that he had "managed to come up with some of his cop buddies to come up here and try to help cover him." Regarding the special-issue question, the prosecutor theorized,

> [H]e's trying to get [Newson] prosecuted.[26] He started lying from the beginning. He lied about the facts and circumstances. He lied in his police report. He said that he had been told multiple times to leave. He said in his police report that he told him he was under arrest before he struck him. The lies started there. He's even on the videotape when Flores is telling Cri[e]ger, his supervisor, what happened. He's even on

---

[26]Later, during rebuttal, the State argued, "The whole point of all of his lies was to wrongfully prosecute that young man," but then conversely argued that Romer's lie "was one last Hail Mary effort to try to avoid prosecution," i.e., "if I can get y'all to believe that I told him he was under arrest then maybe I can get you to believe that he was resisting and that he had committed a crime."

24

the videotape saying to Flores -- I said coaching Flores -- "You told him to leave." Well, you know the whole 50 seconds he was standing there, that was never said either but yet he's trying to put that in there to cover himself. Okay. And so he's lying about the facts and circumstances of the arrest and he continues with that lie to the grand jury. And so, yes, he's trying to get [Newson] prosecuted, and [Newson's] smart-mouthing would have certainly been used against him at his trial had he been successful with his lies.

So the answer to the Special Issue should be, "We do."

The defense focused on its expert's testimony and reiterated that Romer's position was that Article 38.22, Section 4 was not applicable to the prosecution. Defense counsel also argued, "There was no intent to deceive by my client. It was my client's belief[] at the time that this occurred that he said that."

### c. Analysis

Before the jury, the State asserted its position that Section 4 applies generally to officers' statements lying about the circumstances of an arrest and elicited expert testimony affirming that position. During closing argument, the prosecutor told the jury that "from the beginning," Romer was "trying to get [Newson] prosecuted" and that Newson's "smart-mouthing would have certainly been used against him at his trial had [Romer] been successful with his lies." Based on the jury's determination that Romer's grand-jury statement was indeed false and the fact that Newson had been charged with two criminal offenses, the jury's affirmative answer to the special issue was not hard to predict.

25

The obvious harm to Romer is that the jury's affirmative answer to the erroneously submitted special issue made him ineligible for probation when he would otherwise have been eligible. *See* Tex. Code Crim. Proc. Ann. arts. 38.22, § 4, 42A.053(a)(1), (c); *cf. May v. State*, 660 S.W.2d 888, 889–90 (Tex. App.—Austin 1983) (holding that trial counsel's failure to file sworn motion for probation, which "totally precluded the jury from considering probation" and "result[ed] in certain incarceration upon a jury finding of guilt," was reversible error), *aff'd*, 722 S.W.2d 699 (Tex. Crim. App. 1984). Thus, the trial judge was prevented by the jury's finding from considering the full range of punishment. This consequence—corresponding to the fourth *Almanza* consideration—weighs in favor of some harm.

But we are not convinced that Romer did not also suffer "some harm" affecting the jury's verdict that he was "guilty of the offense of aggravated perjury as charged in the indictment." Although the rest of the charge was correct in many respects—e.g., it defined the elements of perjury and aggravated perjury, defined what a res gestae statement is, defined "intentionally" and "with intent," stated that the burden of proof was on the State and that it "never shifts" to the defendant, and set forth that "[a]ll persons are presumed to be innocent"—it was also, in places, internally inconsistent and confusing. For instance, the charge told the jury that whether a statement is material "is a matter for the court" but also that it should "determine by [its] verdict whether as a matter of fact" Romer's statement was material.

26

And contrary to the State's argument to the trial court, the jury's affirmative finding on the special issue did not simply allow enhancement of the aggravated-perjury offense. Instead, the instruction affirmatively directed the jury to presume two elements of the underlying perjury offense: "[Y]ou *will* presume" that Romer "acted with intent to deceive and with knowledge of the statement's meaning" upon finding that Romer had sworn falsely to "facts and circumstances which if true would have rendered . . . [Newson's] statements . . . admissible." [Emphasis added.] Thus, even though the charge instructed the jury on the presumption of innocence, it also—conversely—directed the jury to presume two elements of the offense upon finding the facts and circumstances outlined in the special issue.[27] *See Elizondo v. State*, 487 S.W.3d 185, 206–07 (Tex. Crim. App. 2016) (concluding that "some harm" standard had been met when erroneous provocation instruction in charge "changed the State's burden of proof" by directing the jury, "[Y]ou will find the defendant guilty of murder," if it found Elizondo had provoked the difficulty even though—as the intermediate appellate court noted—the jury had been instructed throughout the

---

[27]Even though the verdict form instructed the jury to "continue on and consider the special issue" only if it found Romer "guilty of the offense of aggravated perjury," the jury had already heard from Stewart that an affirmative finding on the special issue meant it could presume two elements of the charged offense. Thus, rather than allowing us to presume that the jury considered the special issue independently from and after its consideration of the evidence to support the elements of the charged offense, the instruction on the verdict form as to the order of the special issue's consideration merely contributes to the internally inconsistent and confusing nature of the charge.

entire trial that it was the State's burden to prove Elizondo committed murder); *see also Reeves*, 420 S.W.3d at 818–19 (noting that assumption that jury followed instructions as written does not apply when instructions are not understandable and instructing that the charge's function is not "merely to avoid misleading or confusing the jury" but "to lead and to prevent confusion"). This error and conflict—relevant to the first *Almanza* factor—weigh heavily in favor of some harm.

The State exacerbated this confusion by telling the jury in its opening statement and closing argument that Article 38.22, Section 4 applied merely to Romer's alleged "lies," regardless of whether Newson's statements could be considered the result of custodial interrogation. This confusion was further exacerbated by Stewart, who not only opined on a legal question, but opined wrongly.

The State spent much of the trial focusing on whether Romer's statement to the grand jury was false. It spent less time introducing evidence to prove Romer's intent to deceive and knowledge of the statement's meaning. Its circumstantial evidence on those two elements of the offense was hardly conclusive, and Romer challenged that evidence. His counsel told the jury that Romer believed that what he had said was true, and the evidence showed that the video recordings of the incident were in Harris's possession and that Romer had limited access—if any—to that

evidence.[28]  The erroneous instruction to the jury impermissibly tipped the scales in the State's favor on two contested elements of the charged offense and was harmful in light of the entirety of the evidence presented at trial.  *Cf. id.* at 819 (agreeing that inapplicable provocation instruction's mere presence in charge "implied that there was some evidence to support every element of the provocation doctrine when there was not" (quoting *Reeves v. State*, No. 01-10-00395-CR, 2012 WL 5544770, at \*6 (Tex. App.—Houston [1st Dist.] Nov. 15, 2012) (mem. op., not designated for publication), *aff'd*, 420 S.W.3d at 821)).  Accordingly, the second and third *Almanza* factors also weigh in favor of some harm.

Based on our review of the *Almanza* factors, all of which support the conclusion of "some harm" on these facts, we sustain Romer's fifth issue.

## IV. CONCLUSION

Having sustained Romer's fifth and dispositive issue, we reverse the trial court's judgment and remand this case for a new trial.

/s/ Dana Womack
Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  October 27, 2022

---

[28]Harris's records custodian testified that Romer did not have access to any of Harris's recordings and could not have viewed them without the presence of a Harris supervisor.